396 A.2d 1359

**Carol L. SIPE, formerly known as Carol L. Shaffer, Appellee,**

v.

**Delver F. SHAFFER, Appellant.**

Superior Court of Pennsylvania.

Submitted April 10, 1978.

Decided Jan. 24, 1979.

---

1. Dr. Gershman's bills were $110.00, Dr. Abraham's was $70.00 and the American Institute of Hypnotherapy was $150.00.

28

John M. Cascio, Somerset, for appellant.

H. Edwin Mountford, Somerset, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

This is an appeal from an order granting a mother's petition for custody of her two minor daughters. The father of the children contends that the best interests of the children will be served by granting him custody.

The parties were married on December 29, 1968, and had two daughters, Cheryl Lynn, born on June 24, 1970, and Cindy Lynn, born on October 22, 1971. They experienced marital difficulties, separated in May 1974, and were divorced. At the time of the separation the parties agreed that the mother would have custody of the children and that the father could "pick the children up every other weekend Friday and bring them back Sunday evening." (N.T. 4)

The mother testified that in February, 1975, the father picked up the children on a Friday evening but did not return them on the following Sunday. She called the father's mother, who said her son had taken the children on a vacation. Her attempts to locate the children were of no avail[1] until September 30, 1976,[2] when the Pennsylvania

1. The mother described her attempts to locate the children:

A  I tried day care centers, nursery schools. I called the FBI, and they told me there was nothing they could do because of this domestic—it was a domestic problem. I had gone to schools, talked to principals; I had gone to see relatives of his. I was in Maryland, West Virginia and everywhere, just trying to locate them. I had the State Police trying to find them, too.
(N.T. 8)

2. She did have some communication with the children during this time. As she testified:

Q  When was the next time you saw the children after that weekend?
A  September 30, 1976.
Q  That would be over a year later?
A  Yes.
Q  Did you, between that weekend in February of 1975 and the end of September of 1976, attempt to find out where your children were?
A  Yes, I did.
Q  Did you talk to Mrs. Shaffer's family over that long period of time?
A  Yes, I did.
Q  About seeing your children?
A  Yes.
Q  What were you told on these many occasions?
A  Once I had called his—Delver's brother to ask if he would take me to see the children; and he said he would have to ask Delver about it, and that he had refused to let me see them.
Q  Did you have any telephone contact with the children over this period of about a year and a half?
A  Yes, they did call me.
Q  Would you ask them where they were?

State Police informed her that her children had been located in Friendsville, Maryland. She and several members of her family went to the school there and after a confrontation with the father, she was permitted to bring the children back to Pennsylvania with her. (N.T. 5–10) Thereafter she filed the petition that was heard by the lower court. The children were living with her at the time of the hearing.

The mother testified that the children had gotten along very well with her since their return from Maryland, had expressed no desire to return to their father, and were doing well in school, with no scholastic or personal problems. She has remarried, and she stated that the children liked their step-father and had no problems in adjusting to living with him. She and her husband and the children lived in a five room apartment in Central City at the time of the hearing. The mother admitted that since her separation from the father, she had been on welfare, and that her husband was receiving unemployment compensation. She said that during her separation the father had only paid her support for

A  Yes, I did.

Q  What were you told, or what happened?

A  They told me that they weren't allowed to tell me where they were.

Q  Did you talk to your husband by telephone over this period of time?

A  Yes, I did.

Q  Did you ask him if you could see the children?

A  Yes.

Q  What were you told?

A  He wouldn't—he said he wouldn't bring the children back until I signed the custody over to him.

Q  In other words, he refused to allow you to have a personal visit with your children, is that correct?

A  Yes.

Q  During this period of time, for birthdays and Christmas and the like, were you able to get messages or presents to your children?

A  Yes.

Q  How were you required to do this?

A  I would take the presents either to Delver's mother or his sister.

Q  Did you request to see your children on the holidays that I've described?

A  Yes, I did.

Q  Were you refused?

A  Yes.

(N.T. 6–8)

the children on those weeks in which he had visitation and that he had refused to pay support since the children's return from Maryland. The mother's husband testified that he got along well with the children. Several witnesses, including the mother's landlady and minister, testified on the mother's behalf concerning her fitness as a mother. (N.T. 33–43)

The father testified that he had started withholding child support payments only because the mother had started withholding visitation.[3] He said the children had been unhappy with their mother and admitted that he had taken them away in February 1975, first to Sarasota, Florida, and then to Friendsville, Maryland; he also admitted that he had refused to tell. the mother where the children were.[4] He

---

**3.** With respect to his support obligation the father was questioned by the hearing judge as follows:

Q You were rather hesitant when your attorney asked you about whether you would, pay support if you are required to, or something to that effect; and you said, well, you probably would.

A Well, it comes to the fact that I'm not happy with the circumstances that my children are in. I don't feel that that's a fit environment. And I'm willing to—it has nothing to do with me loving the children. We don't measure love by how much we put on a check. At least I don't, and I never will.

Q But it kind of helps the stomach when there's a check, doesn't it?

A Well, Welfare is interpreted into this all along, so I'll just let them. As far as the kids are concerned, they didn't starve. And they'll always have good clothes so long as I'm alive. And as long as Welfare says that's a fit environment, this fight is going to be always going on.

Q So your way of fighting that is not giving any support?

A When I see them, I can buy them clothes. That goes directly to them. Not just handing out a dollar sign. It goes directly to them. I know that.

Q So you don't think any money you would give to your former wife would go for their support and maintenance?

A Some might.

Q Not all?

A Right.

(N.T. 67–68)

**4.** On cross-examination the father described how he treated the mother after absconding with the children:

Q Now, Mr. Shaffer, do I understand it correctly that after you took the children in February of 19—

A '75.

testified that the children had been happy and well cared for while with him in Florida and Maryland. At the time of the hearing the father was earning $400 a month in take home pay. If given custody he planned to have the children live with him and his mother in her house in Pennsylvania. Since both he and his mother worked, there would be periods when no one would be watching the children but he said that when he and his mother were unavailable the children could

Q —'75, that you went to Florida?
A Yes.
Q Where did you go in Florida?
A Sarasota.
Q And how long did you stay there?
A Approximately a month.
Q How long after you got to Sarasota, Florida, was it before you told your wife where you were?
A I didn't.
Q I beg your pardon?
A I didn't.
Q Oh, you didn't?
A No.
Q Didn't you think she'd be worried about her children?
A I called her and I told her that the children were all right. And I had the children talk to her.
Q You didn't think it was important that she might know where the children are?
A No.
Q You didn't think that was important. Okay. Then you left Florida and came back to Friendsville, is that correct?
A True.
Q And you remained in Friendsville until September 30th of 1976, is that right?
A Right.
Q And where did you live when you were in Friendsville?
A In a trailer.
Q Were you renting or buying the trailer?
A Renting.
Q And how long was it after you got back to Friendsville that you told your former wife where the children were?
A I never told her where I was.
Q I beg your pardon?
A I never told her where I was.
Q How long was it after you got back to Friendsville before you attempted to gain custody by some legal means in the State of Maryland?
A I didn't.
Q You didn't?
A No.
(N.T. 59–60)

be watched by his sister, who operated a day care center. (N.T. 44–58)  His mother testified in support of his love for the children and her willingness to care for them.  (N.T. 69–73)  Written testimonials from several persons who had known the father and the children in Maryland were also offered.

At the end of the testimony the father requested that the children be called to express their preference, but the judge, after discussion with both sides, decided that such testimony was not needed since it would be given little weight because of the children's ages.  A probation officer's report containing an interview with the children concerning their preference was introduced without objection by either side.  This report indicated that the children were happy living with the mother and her husband and preferred living with the mother.  (Joint Exhibit 1)

In the opinion in support of the order awarding custody to the mother, the hearing judge says:

> The record shows that respondent did provide an adequate home for his daughters for the year-and-a-half he had them in Maryland.  If granted custody, respondent would now make a home for the children with his mother in Somerset.  There is testimony that this home would be adequate.  However, both respondent and his mother are employed and there would be a period each afternoon when the girls would have to be alone at respondent's mother's home.  Respondent suggests he would make arrangements with a sister to care for the children during this time.

> The record also shows that petitioner and her new husband are currently providing a good home and education for the children.  The girls are enrolled in Shade-Central City schools and attend the Central City United Methodist Church and Sunday School regularly.  We would hesitate to force the children to change schools again, which would be the third time within a year.  We think it important for the welfare of the children that

their educational and religious training have some stability. Petitioner is also a full-time housewife who would be able to devote her full attention to these children.

We have been presented with no evidence that the mother is unfit. We believe it will be best for these two small girls to be raised in a family circle that includes two parents, as will be the case here with petitioner and her husband. (Lower Court Opinion at 4) [5]

It is established that the scope of review of this court in a child custody case is of the broadest type. *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978); *In re Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976); *In the Interest of Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976). The hearing judge must make a comprehensive inquiry and his decision must be supported by a full discussion of the evidence. *Scarlett v. Scarlett, supra; Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Where the hearing judge has failed to comply with these requirements, we have not hesitated to remand, but if the hearing judge has complied with these requirements, we must defer to his findings. *Scarlett v. Scarlett, supra; Commonwealth ex rel. Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977). However it is well settled that "[a]lthough we will not nullify the fact finding function of the hearing judge we will not be bound by the deductions or the inferences made by the lower court from these facts," but will make an independent judgment based on the evidence. *Scarlett v. Scarlett, supra.*

The paramount concern in a child custody proceeding is the best interest of the child. *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth*

---

5. In his opinion the hearing judge warned the father of his duty to provide support and cautioned that support should not be used as a weapon in a custody fight. The judge also stated that the father's actions in withholding support and in absconding with the children indicated bad faith. (Lower Court Opinion at 5–6)

*ex rel. Tobias v. Tobias, supra.* The contesting parents equally share the burden of proving best interest, *In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977); there is no longer a tender years presumption in favor of granting custody to the mother, *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *McGowan v. McGowan,* 248 Pa.Super. 41, 374 A.2d 1306 (1977).

Both parents in this case presented evidence demonstrating that they loved the children and that they were able and willing to care for them. It is undisputed that the father would have provided the girls with a good home, but the hearing judge after a thorough review of the facts held that custody should remain with the mother with visitation rights to the father. In so holding the judge specifically eschewed the tender years presumption (Lower court opinion at 5); instead, as indicated in his opinion, he was convinced that the benefit of remaining in the same school, of having two parents in the home—mother and stepfather—and of having someone home when they were not in school, made the children's situation in the mother's home better than their situation would be in the father's home. The father produced no evidence, nor does our own review of the record disclose any evidence, that persuades us that the judge's findings were in error.[6] Accordingly, we shall affirm the

6. The father made two allegations concerning the mother's ability to care for the children. He alleged that the mother had a drinking problem, but this allegation was expressly contradicted by the testimony of other witnesses. In fact on cross-examination the father admitted that he had never seen the mother drunk but had based his allegation solely on the fact that once when he had visited her he "noticed . . . there was a lot of beer in the refrigerator." (N.T. 63) The father also alleged that the mother had psychological problems and because of them once had to be hospitalized during their marriage. (N.T. 65) The psychological problems were explained as being caused by the mother's domestic problems with the father, which led to the parties' separation and divorce. There was no evidence that these psychological problems existed at the time of the hearing. *See McGowan v. McGowan, supra* (custody to be awarded on present not past conditions).

judge's decision to grant custody of the children to the mother.

█ The father argues that the hearing judge erred in not considering the preferences of the children. We have held that a child's preference is a factor to be considered in awarding custody, but the weight to be accorded to this preference will vary according to the age, intelligence, and maturity of the child. *Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Commonwealth ex rel. Tobias v. Tobias, supra.* In this case there was some dispute concerning the preferences of the children. Considering their ages—five and six years—we do not think it was an abuse of his discretion for the hearing judge to decide that the children should not be subjected to an in-court interview.[7] *But see Stoyko v. Stoyko,* 254 Pa.Super. 78, 385 A.2d 533 (1978) (preference of mature ten year old).

█ The father also argues that the hearing judge erred in admitting the probation officer's report. In support of this argument, he cites *Wood v. Tucker,* 231 Pa.Super. 461, 332 A.2d 191 (1974). In that case the lower court, in awarding custody, relied on ex parte reports and statements outside the record. In reversing, this court held that this represented a violation of due process. In the present case, however, the probation officer's report was introduced at the hearing with both parties and both counsel present; the probation officer was present; and no one objected to the admission of the report,[8] which was made part of the record

7. In any case where the child is to be interviewed in court concerning his preference, counsel for both sides must be present and the interview must be transcribed and made part of the record. *See Gunter v. Gunter, supra.*

8. Our reference to the presence of counsel and the fact that no objection was made pertains only to the conclusion that the probation officer's report was made part of the record and thus that its admission was not violative of *Wood v. Tucker, supra.* This reference in no way involves the issue of waiver and does not therefore undercut the rule that waiver does not obtain in a child custody dispute. *See Gunter v. Gunter, supra.*

as a "Joint Exhibit". The hearing judge therefore did not err in admitting and considering [9] the report.

Affirmed.

HOFFMAN, J., did not participate in the consideration or decision of this case.

[9]. The hearing judge only considered the probation officer's report as it contained a statement of the girls' preference to live with their mother. Yet, as discussed above, the judge refused to give much weight to any statement of preference because the girls were so young.