407 A.2d 875

**Dennis McCOURT, Appellant at No. 752,**

v.

**Regina MEYERS, Appellant at No. 722.**

Superior Court of Pennsylvania.

Argued April 9, 1979.

Decided July 18, 1979.

---

George H. Hoffman, Pittsburgh, submitted a brief for appellant at No. 722 and appellee at No. 752.

Anthony A. Seethaler, Jr., Pittsburgh, for appellant at No. 752 and appellee at No. 722.

Before PRICE, HESTER and MONTGOMERY, JJ.

HESTER, Judge:

In this child custody dispute, the lower court awarded a nine year-old girl to the custody of her mother with liberal visitation privileges to the father. Both parties have appealed. The court has filed a comprehensive opinion explaining its decision based upon a full and complete record. Accordingly, we will affirm its decree in entirety.

Preliminarily, we note the scope of our review in child custody cases is of the broadest type. *Sipe v. Schaeffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979); *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978). To facilitate our review, we require the hearing judge to file in every such case "a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for its ultimate decision." *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 237, 312 A.2d 58, 63

(1973); *Bender v. Bender*, 261 Pa.Super. 12, 395 A.2d 279
(1978). Where the court has complied with these requisites,
its decision will not be reversed, absent an abuse of discre-
tion. *In Re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d
1057 (1978); *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d
1372 (1977). Further, while we will not nullify the fact
finding function of the court, we are not bound by deduc-
tions or inferences which have no competent evidence to
support them. *Tomlinson v. Tomlinson*, 248 Pa.Super. 196,
374 A.2d 1386 (1977). The paramount concern in such a
proceeding between parents is the best interest of the child.
*Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296
A.2d 625 (1972), which encompasses the child's physical,
intellectual, moral, and spiritual well-being. *In Re Custody
of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). So
stated, our review of the record reveals the following:

The parents, Dennis McCourt and Regina Meyers, were
married September 19, 1964 and were divorced seven years
later. The marriage produced two children: Lisa, killed in a
traffic accident in 1973, and Linda, born June 24, 1968, the
subject of the instant custody proceeding. When the couple
separated shortly before the divorce, Linda continued living
with her mother and saw her father every Sunday, staying
with him one weekend per month. In December, 1975,
Regina married Jack Meyers, a widower with three sons, and
moved with Linda into the Meyers home in Shaler Township,
Allegheny County. The house has three bedrooms, two
bathrooms, a kitchen, dining room, living and family rooms.
Only the two youngest Meyers boys, Jackie and David,
reside at home. Linda attends the public elementary school
one mile distant from home. Regina Meyers, although hav-
ing worked for a bank at the time of her remarriage, has
since resigned and is now a housewife able to attend to
Linda's needs, and sees her off to school each morning. Jack
Meyers is the sole source of support for his family. At the
time of the custody hearings, the Meyers, were contemplat-
ing a move to Arizona.

Dennis McCourt has not remarried. He lives with his mother, Bridget McCourt on Pittsburgh's North Side, in a one-bedroom apartment owned by Dennis' sister Alice Reagan and her husband. The Reagans own a home next door to the McCourt apartment and themselves have five children living therein. Dennis conceded that, should he gain custody of Linda, he and his mother would find more spacious living quarters, possibly in a nearby duplex, also owned by the Reagans. Both Dennis' mother and sister are willing to help in the care and upbringing of Linda. Presently, Dennis is employed with the Pennsylvania Department of Public Assistance at $11,000.00 per year.

Much of the evidence at the hearings[1] focused upon Linda's home life with the Meyers, and Dennis' attack upon the adequacy of her care. In June, 1977, Regina Meyers entered the hospital for surgery and remained therein for about 25 days. During this time period, Jack Meyers prepared the family meals and generally assumed responsibility for his wife's motherly duties. One evening, before dinner, Linda was playing with friends across the street and was summoned home for dinner by her step-father. When Linda repeatedly failed to respond, Mr. Meyers crossed the street and paddled Linda with a breadboard in full view of the neighbors. At this point, the stories of several witnesses diverge,[2] but it seems Mr. Meyers then took the screaming child back into the house and forbade her to go outside again that evening. On another occasion, as Linda was practicing piano, her step-father sat down beside her and "tapped her fingers" while reprimanding her that her playing was not correct. R. 201. There was also much emphasis on Mr. Meyers' treatment of his other children, particularly of Jackie, his thirteen year-old son. In response to questions posed by the court, Linda stated her step-father frequently kicks Jackie in the leg and hits him on the head with his

1. Three days of testimony consumed 309 transcribed pages.

2. Two neighbors testified Mr. Meyers continued to beat Linda all the way back across the street. A Mrs. Wilson stated she saw him hit Linda in the head with the breadboard.

knuckles. Mr. Meyers admits he "may have" kicked his son or tapped him on the head, explaining, "this is the way I used to play with my older son." R. 245–6. He also stated he occasionally taps Linda on the head with the top of his fingers, while Linda told the hearing court that Mr. Meyers uses his knuckles on her. Dennis McCourt testified he will sometime find scratches and black and blue marks on Linda when he sees her. Linda told several witnesses at diverse times that her step-father sometime hits her and that she does not like it.

The hearing judge conducted three separate interviews with Linda with all other witnesses excluded. On each occasion, the court explored Linda's life style with the Meyers and with her father and asked Linda her preferences. In the first two interviews, Linda stated she did not know which house she would rather live in, indicating she would be happy with either choice. In the final interview, conducted without presence of counsel,[3] Linda said she would like to live with her father because "I get a dog" and "cause sometimes I'm afraid of Jack." R. 311. Under such an arrangement, Linda admitted she would miss her mother and did not believe her mother would move to Arizona without her.

A court appointed psychologist, Dr. Mary Cochran, conducted interviews with Linda, the Meyers, and the McCourts in September and October, 1977. She found Linda to be an extremely appealing young girl who relates easily to those around her and who is very close to both her families. Her unstable domestic situation causes her to feel stress, pressure, and fear that one of her parents may be hurt by whatever decision is made. According to Dr. Cochran, if Linda were to make a decision as to placement, it would be "to keep things the way they are presently." Mr. McCourt was found by Dr. Cochran to be a well-kempt, well-spoken man who is obviously distressed by what he feels is inadequate care of Linda in her present home. The child blends

---

3. Counsel agreed not to be present, so long as the court appointed psychologist, Dr. Mary Cochran, attended.

in well with McCourt, his mother, and extended family, all of whom the father would require to help care for Linda. When visiting her father, Linda spends a great deal of time with her cousins, the Reagan children, particularly with Bridget, Linda's junior by one year.

Dr. Cochran found the Meyers' home to provide a normal family environment. The Meyers eat meals together, participate in recreational activities, and demonstrate genuine affection for one another, sprinkled with occasional bickering and normal family disputes. Neither Regina nor Jack Meyers want Linda to sever ties with her father but feel they have raised Linda to be a good, happy, normal little girl who models the behavior and values they have taught her. The incident with the breadboard was found by Dr. Cochran to be "a most unusual incident" prompted by stress occasioned during Regina's prolonged hospitalization. "Physical punishment is the exception, rather than the rule. . . ." Psychologist's Report at 3. The Meyers' proposed move to Arizona is related to business opportunity for Mr. Meyers and to climate. Dr. Cochran recommended the court maintain, to the greatest degree possible, the status quo, in order to ensure the continued love and support for Linda from both sources.

By final order dated February 13, 1978, the court modified an earlier ruling with the following effect: a) primary custody of Linda is awarded to her mother, Regina Meyers; b) the father, Dennis McCourt, shall have custody of Linda every other weekend and for four weeks during the summer; c) if the Meyers relocate to Arizona, Linda shall spend the entire summer with her father, except for the first or last three weeks of summer recess; Linda shall also spend with her father Christmas and Easter vacations as well as any period in which Mr. McCourt is present in Arizona; d) round trip air transportation expenses for Linda's trip to Allegheny County will rest with her mother, except: Dennis McCourt shall reimburse Regina Meyers for one-half of these costs incurred in any calendar year in which McCourt has not on at least two occasions visited Linda in Arizona.

The court found such an arrangement promotes Linda's best interest since it allows her to live for most of the year with her mother, "the most important person in Linda's life." The liberal visitation privileges, on the other hand, "permit Linda to maintain her excellent relationship with her father and his family." The order further encourages the father to visit his daughter frequently, should the Meyers relocate, by minimizing the financial burden on Mr. McCourt occasioned by such trips. Opinion at 6–7.

■ Our independent review of the record pursuades us the court's decision is supported by adequate and competent evidence. We can only agree with the hearing judge and with the court-appointed psychologist that both parents are deeply devoted to Linda and are quite capable of providing a suitable home and happy environment so vital to the maturing process of a young child. See, *In Re Custody of Phillips*, 260 Pa.Super. 402, 394 A.2d 989 (1978); *Custody of Neal*, supra; *Davidyan v. Davidyan*, 230 Pa.Super. 599, 327 A.2d 145 (1974) (wherein we were likewise faced with choices between two extremely fine parents). The record demonstrates Linda is a normal, well-adjusted, well-mannered girl because of the close, stable, and loving relationship her parents have nurtured with her. To date, her mother has been the most important person in her life, yet we cannot ignore that her father, paternal grandmother, paternal aunts, uncles, and cousins have also played a very important role in her young years, particularly since her parents' separation. Although much emphasis was placed on Linda's less than ideal relationship with her step-father, there is no suggestion that these problems have in any way retarded her emotional and psychological development. To the contrary, the child has adjusted remarkably well to the stresses and pressures occasioned by the instant custody proceeding. Further, the record is simply devoid of any indication that physical reprimand is a frequent tool of Mr. Meyers upon Linda. The child was given numerous opportunities, outside the presence of her step-father, to state. that he had ever hurt her, yet she declined to say so, notwithstanding the testimony of neighbors.

■ Appellant McCourt places strong emphasis on Linda's stated preference, during the third interview, to live with her father. We have long held that a child's preference is a factor to be considered in awarding custody, but it is not controlling. *Sipe v. Schaeffer,* supra; *Tobias v. Tobias,* supra; *Commonwealth ex rel. Murphy v. Walters,* 258 Pa. Super. 418, 392 A.2d 863 (1978); *In Re Leskovich,* 253 Pa.Super. 349, 385 A.2d 373 (1978); *In Re Custody of Carlisle,* 225 Pa.Super. 181, 310 A.2d 280 (1973). Instantly, we have noted that, on two occasions, Linda was asked by the court in which home she would prefer to live. She could not make a choice. Suddenly, in the third interview, she stated:

A. I know who I want to live with.

Q. And who is that?

A. My dad.

Q. How come?

A. I don't know. When I live with my dad, I get a dog.

Q. You'll get a dog when you go live with your dad? Is that why you would like to live with him?

A. That's not the only reason.

Q. What other reasons are there?

A. Cause sometimes I'm afraid of Jack.

Q. Does that happen a lot?

A. Just sometimes. He's usually yelling.

R. 311.

■ Initially, we could hardly accept the benefits of a dog as an adequate reason for upsetting Linda's established relationship with her mother. See, *Trefsgar v. Trefsgar,* 261 Pa.Super. 1, 395 A.2d 273 (1978). Further, her expressed fear of her step-father must be considered in light of the psychologist's report that Linda and her father demonstrate a mutual affection for each other: Linda "runs to see Mr. Meyers when he comes in from work . . . [I]t is obvious from their interactions that a mutual affection exists between them." We agree with the lower court that, while Linda does not have an extremely close, trusting

relationship with Jack Meyers, nonetheless, evidence of affection is evident, and the negative side of their dealings will not cause us to remove Linda from her mother's home. Moreover, this Court has observed previously that we are aware of the well-recognized tendency among children of tender years to change their minds and desires from time to time. *Commonwealth ex rel. Bender v. Bender*, 197 Pa.Super. 397, 178 A.2d 779 (1962). Finally, Linda's belated statement of preference is not the kind of "emphatic and adamant" choice we have found so persuasive in other cases. *Stoyko v. Stoyko*, 254 Pa.Super. 78, 385 A.2d 533 (1978) (ten year-old boy expressed "emphatic" preference for his father; custody awarded to father); *In Re Russo*, 237 Pa.Super. 80, 346 A.2d 355 (1975) (nine year-old boy's "adamant" preference for father; custody awarded to father); *Commonwealth ex rel. McDonald v. McDonald*, 183 Pa.Super. 411, 132 A.2d 710 (1957) (twelve year-old boy's "emphatic" preference to live with aunt; custody awarded to aunt). We accordingly afford little weight to the child's change of mind, particularly where her best interest points to the opposite choice. See, *Commonwealth ex rel. Baisden v. DeMarco*, 215 Pa.Super. 38, 257 A.2d 365 (1969); *Commonwealth ex rel. Hickey v. Hickey*, 213 Pa.Super. 349, 247 A.2d 806 (1968).

We have recently recognized the growing concern among courts and child experts that established relationships of young children be not disrupted. *Tomlinson v. Tomlinson*, supra; *Sweeney v. Sweeney*, 241 Pa.Super. 235, 361 A.2d 302 (1976). The rationale underlying this concern is the child's initial need for stability in his early years and that, if a change is to occur, it should be in the later years when he has better control over his environment. Instantly, Linda has lived with her mother for her entire eleven years and could not even conceive of the possibility that her mother might move West without her. The psychologist indicated removal of her mother *or* her father "is out of the question and could only cause psychological damage to the child about whom all are so concerned." We thus agree with the lower court that it is necessary to preserve to the

greatest extent possible, the existing relationship with both parents. We think the order entered by the hearing judge effectuates this end.[4] Moreover, we find no reason to upset the court's allocation of travelling expenses, should the move to Arizona occur. The court's decree recognizes Mr. McCourt will want to visit his daughter if she moves and thus his financial burden should be eased in accordance with his trips to Arizona. See, *Davidyan*, supra; *Commonwealth ex rel. Ball v. Wreski*, 165 Pa.Super. 6, 67 A.2d 595 (1949).

Order affirmed.

4. We reject Mr. McCourt's suggestion that we order the mother to forfeit her custody of Linda should the Meyers move to Arizona. Such a contention was considered and dismissed in *Davidyan v. Davidyan*, supra, and what we said there applies with equal force here:

> To condition [the mother's] custody on her remaining here, as appellant suggests, would be to use the child to force [her] into a situation unreasonable as to her and of no advantage to the child. There is no evidence that [she] is attempting to alienate the child's affections for [the father]. No doubt the arrangement provided by the order of the court below is not satisfactory to him, but it recognizes his interests and places no financial hardship on him. Custody orders seldom are satisfactory to both parties.

230 Pa.Super. at 606, 327 A.2d at 149.