426 A.2d 108

**Joan L. PARKS, Appellant,**

**v.**

**James Robert PARKS.**

Superior Court of Pennsylvania.

Argued June 10, 1980.

Filed Feb. 13, 1981.

Petition for Allowance of Appeal Denied May 19, 1981.

Reconsideration Denied July 2, 1981.

402

Fronefield Crawford, Jr., West Chester, for appellant.
George J. Brutscher, Kennett Square, for appellee.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

HESTER, Judge:

In this child custody proceeding, the mother appeals from an order of the court below establishing permanent custody in the father. For the reasons which follow, we will reverse.

Pertinent facts adduced at the hearings below were as follows. The parties, James Robert and Joan Parks, were married in July, 1972 and resided in Kennett Square, Chester County, Pennsylvania. One child resulted from the

marriage: Becky, born November 30, 1972, the subject of the instant dispute. Marital difficulties developed and the couple separated in June, 1976 with Mrs. Parks and Becky moving into her mother's home and thence to an apartment in Kennett Square. The parties entered into a written agreement at this time whereby custody of Becky was given to Mrs. Parks, with the father retaining broad visitation privileges. Mrs. Parks was employed as a bank teller and arranged for a baby sitter during the day. The Parks' were divorced in December, 1976.

In the Fall of 1977, Mrs. Parks moved with Becky to Roswell, Georgia, a suburb of Atlanta, where they resided with Mrs. Parks' aunt and uncle, Nancy and Bob Kimbell. Becky attended kindergarten and lived with her mother there until May, 1978. At that time, Becky came back to Pennsylvania to spend the summer with her father, in accord with the custody and visitation agreement.[1] Her mother, meanwhile, remained in Roswell and attempted unsuccessfully to enroll her in the first grade there for the Fall. Since Becky would not turn six until after school opened in September of that year, Georgia law forbade her from entering first grade. Thus in August, 1978, the parties mutually agreed that it would be in the child's best interests for her to remain with her father so she could enter first grade in Pennsylvania. Once that was accomplished, there would be no impediment to admitting her into the second grade the following year in Georgia. R.R. 19–22.

In September, just before school began, Mrs. Parks visited her daughter in Kennett Square and, at the end of her stay, prepared to return to Georgia. As her former husband drove her to the airport, he showed her, for the first time, a document he had prepared relating to custody of Becky. The parties had previously discussed this new agreement

1. There was some testimony suggesting that an outbreak of lice occurred in Becky's kindergarten class and that her mother wished to remove her from that area for the summer. However, the record is clear that the principal reason for sending Becky to Pittsburgh for the summer was so she may spend that time with her father in accord with the previous agreement.

and Mrs. Parks, thinking the agreement only granted temporary custody to her husband for that school year, readily signed the paper. In reality, this document established permanent custody of Becky in her father.

During the subsequent school year, Becky lived with her father in his one-bedroom apartment in Kennett Square. Mrs. Parks travelled to Pennsylvania three times to visit her daughter. On July 15, 1979, during the fourth and final visit, the parties had a confrontation in Mr. Parks' apartment concerning Becky's return to Georgia. Mr. Parks insisted that he retain permanent custody of his daughter while Mrs. Parks was adamant that Becky live with her in Georgia. The argument ended with Mr. Parks ordering his former wife out of the apartment and expressing his intent that she never see Becky again. Mrs. Parks spent the night at her mother's home nearby.

The next day, Mr. Parks took Becky to the home of his sister, Donna Ifert, while he went to work. Mrs. Parks dropped by to take Becky to her regular swimming lesson and, following a phone call to Mr. Parks, Mrs. Ifert released Becky to her mother. Mrs. Parks proceeded immediately to consult legal counsel, whereupon the instant petition to establish custody was filed on her behalf in the Court of Common Pleas, Chester County. The appellant-mother then returned with Becky to Georgia. Hearings on the petition were held on August 14 and 15, 1979. The following day the court entered an order dismissing the mother's petition for lack of jurisdiction, citing "the Uniform Child Custody Jurisdiction Act, 11 P.S. § 2309(a), and the Commonwealth Child Custody Jurisdiction Act, 11 P.S. § 2409(a)." R.R. iva. The court's order also stated that custody shall be with the father. An opinion in support of the order followed in which the court again stated it denied jurisdiction, citing the Uniform Act, and then proceeded to the merits to establish custody in appellee. This appeal ensued.[2]

2. The appellee-father has elected not to file a brief on this appeal.

In *Lewis v. Lewis*, 267 Pa.Super. 235, 242, 406 A.2d 781, 783–4 (1979) we summarized the law governing a proceeding of this type:

It is settled that the paramount concern in a child custody proceeding is to determine what is in the best interests of the child. *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979). In a contest between parents, each party bears the burden of proving that an award to that party would be in the best interests of the child. *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). The award must be based on the facts of record and not on mere presumptions; in particular, the tender years presumption is no longer recognized, *Sipe v. Shaffer*, supra; *McGowan v. McGowan*, 248 Pa.Super. 41, 374 A.2d 1306 (1977).

In order to ensure that the best interests of the child will be served, the appellate court will engage in a comprehensive review of the record. *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978); *In re Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976). Thus, while it will defer to the lower court's findings of fact, the appellate court will not be bound by the deductions or the inferences made by the lower court from those facts, but will make an independent judgment based upon its own careful review of the evidence. *Sipe v. Shaffer*, supra; *Scarlett v. Scarlett*, supra. In conducting this review, the appellate court will look to whether all the pertinent facts and circumstances of the contesting parties have been fully explored and developed. See *Sipe v. Shaffer*, supra; *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). It is the responsibility of the lower court to make a penetrating and comprehensive inquiry, and if necessary, to develop the record itself. See *Commonwealth ex rel. Cox v. Cox*, 255 Pa.Super. 508, 388 A.2d 1082 (1978). After fulfilling this responsibility to ensure a complete record, the court must file a comprehensive opinion containing its findings and conclusions. See *Valentino v.*

*Valentino,* 259 Pa.Super. 395, 393 A.2d 885 (1978); *Gunter v. Gunter,* supra. Only with the benefit of a full record and full opinion can the appellate court hope to fulfill its responsibility of conducting its own careful review. *Valentino v. Valentino,* supra. Where the record is incomplete or the opinion of the lower court is inadequate, the case will be remanded. See *Valentino v. Valentino,* supra; *Commonwealth ex rel. Forrester v. Forrester,* 258 Pa.Super. 397, 392 A.2d 852 (1978); *Commonwealth ex rel. Cox v. Cox,* supra.

■ Under these standards, we find the lower court's opinion inadequate in several respects. First of all, it is unclear whether the court declined to exercise jurisdiction, under the Uniform Child Custody Jurisdiction Act, or whether it instead reached the merits of the case and determined custody based upon the child's best interests. To the extent the court relied upon § 2309(a) (11 P.S.) to deny jurisdiction, it was in error. That section provides:

§ 2309.  Jurisdiction declined by reason of conduct

(a) If the petition for an initial decree has wrongfully taken the child from another state or has engaged in conduct intending to benefit his position in a custody hearing conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

The court apparently determined that when Mrs. Parks unilaterally took Becky back to Georgia in July, 1979, she was violating this section. However, the Act is clearly aimed only at deterring parents from surreptitiously spiriting a child into this Commonwealth from another state in order to avail themselves of this Commonwealth's jurisdiction in a custody dispute. "The general purposes of this Act are to . . . deter abductions and other unilateral removals of children undertaken to obtain custody awards." 11 P.S. § 2302(a)(5). Mrs. Parks did not file her petition in Georgia and force her former husband to litigate his case therein; rather, she voluntarily submitted her cause to the jurisdiction of the Pennsylvania court where it was most convenient for Mr. Parks. Her actions were thus not taken "to benefit

[her] position in a custody hearing." However, ill-advised Mrs. Parks conduct may have been in taking the child without notice to the father, see fn. 3, *infra*, her actions were simply not the type which would cause the court to deny jurisdiction under the Act.

■ After seemingly declining to exercise jurisdiction, the lower court nonetheless proceeded to the merits of the case to determine Becky's best interests. The court's entire discussion of this issue consumes slightly more than two pages and reads as follows:

The evidence established that the mother voluntarily relinquished custody of her daughter to the father to enable the child to continue her education, uninterrupted by state requirements of age.

The mother was not coerced or forced into executing the agreement giving custody to the father. That agreement provided for modification upon changes of circumstances.

The evidence further establishes that the child progressed in school while residing with her father to the extent that she was eligible for advanced placement or standing at the end of that school year.

The mother admitted that the father was a fit parent and had no objection to the manner of care and love that the child received from the father, his relatives and from her mother, the child's maternal grandparent.

Despite any alleged ill treatment of the mother by the father, there was no proof of credible testimony that the acrimony existing between the parties was displaced to the child by the father. On the contrary, however, the Court finds that the mother did attempt to exercise influence over the child's choice of her custody, in part by the mother's removal of the child to Georgia after consultation with and obtaining legal advice and in part by the testimony of the child which the Court finds was influenced by the mother.

Nor did the mother convince us that the husband's living arrangements were unsuitable for the child. She,

herself, spent ten days in that apartment with her daughter and former husband and voiced no objection during that period. It was only after the father's concern that the mother planned to remove the child and take her permanently to the State of Georgia and their discussions concerning that, that the mother who lived in close proximity to the father [sic]. It was this concern that forced the father to deny the mother access to the child for the one day, and in fact, he relented and permitted the mother to take the child to her swimming lesson, only to later learn that the mother removed the child to Georgia.

While we do not question the mother's fitness, the work schedule of both parents would necessitate the use of a babysitter to accommodate the parents' obligation to fulfill their employment schedule.

The burden of proof is shared equally by the contesting parents. We find no compelling reason to conclude that the best interests of the child were not served by permitting custody, which she voluntarily relinquished, to remain with the father who has available a suitable residence, exhibits love and affection and desire to further the interests of the child.

This summary of the evidence does not represent the "penetrating and comprehensive inquiry" required by our cases. *Lewis*, supra. The court failed to explore the home environment offered by both parents for the child, particularly that offered by Mrs. Parks. *Kessler v. Gregory*, 271 Pa.Super. 121, 412 A.2d 605 (1979). Nor did the court mention that the father now resides in a new home and no longer lives in the apartment described in the opinion. Further, the court did not consider the fitness of the "surrogate" parents, i. e., those who will care for Becky while the parents must work, *Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979); *In Re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978). The court made no mention of the testimony of several other witnesses who offered aid in assessing the fitness of each parent to care and supervise the child. *Kimmey v. Kimmey*, 269 Pa.Super. 346, 409 A.2d 1178

(1979); *Commonwealth ex rel. Forrester v. Forrester*, 258 Pa.Super. 397, 392 A.2d 852 (1978). Finally, as we read the court's opinion, a great deal of emphasis is placed on the fact that the appellant-mother "voluntarily relinquished" custody to the father by signing the 1979 agreement. This conclusion is simply not supported by certain undisputed portions of the record, which we shall discuss. See, *Summers v. Summers*, 273 Pa.Super. 285, 417 A.2d 651 (1979); *Garrity v. Garrity*, 268 Pa.Super. 217, 407 A.2d 1323 (1979).

■ When faced with such deficiencies in the court's opinion, we have frequently remanded for the filing of a comprehensive opinion discussing fully the merits of the case. See, e. g., *Summers, Kimmey, Garrity, Lewis,* supra. In the instant case, however, two considerations preclude a remand. First, it appears that the judge who conducted the hearings below has since resigned from the bench. We have previously declined to remand custody cases in similar situations, noting:

> To remand now, would mean not a remand for completion of the record or for a fuller opinion, but to start the proceedings all over again. Hearings would have to be held again, and once more the [child] and [her] parents, would be forced to come to court and litigate differences. To put the [child] through such proceedings, unnecessarily, would not serve [her] best interests.

*Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 204, 374 A.2d 1386, 1390 (1977) (hearing judge retired); accord, *Commonwealth ex rel. Husack v. Husack*, 273 Pa.Super. 192, 417 A.2d 233 (1979) (hearing judge elevated to appellate court). Second, we have engaged in a comprehensive review of the proceedings below, as is our duty, *Lewis,* and find the record sufficiently complete to enable us to determine where the merits of the appeal lie. *Pamela J. K. v. Roger D. J.*, 277 Pa.Super. 579, 419 A.2d 1301 (1980); *Jon M. W. v. Brenda K.*, 279 Pa.Super. 50, 420 A.2d 738 (1980); *Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979); *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *Tomlinson, Hernandez,* supra, (cases where we reached the merits de-

spite procedural difficulties and where the record was sufficiently well developed). Accordingly, we will enter an order based upon the merits.

The record shows that the mother now resides with her aunt and uncle, the Kimbells, in a house situate on a quarter acre of land in Roswell, Georgia. The property is located in a large housing development with two swimming pools and a community recreation facility. Becky has her own room in the house and while residing there she has made many friends among the children with whom she attended kindergarten. In addition, there are many children her age living in the same housing development. The school which Becky would attend is within walking distance of her home—about five minutes away—and is accessible through a pathway used by many neighborhood children going to an from the school.

Presently, Becky's mother, the appellant herein, is employed as a restaurant manager in Roswell and works five days weekly. On Sunday, Monday and Tuesday, she begins work at 6:00 a. m. and is home no later than 4:00 p. m. On Wednesday and Thursday, she begins at 2:00 p. m. and arrives home at midnight. Friday and Saturday are her days off. When Mrs. Parks is not at home, the Kimbells take care of Becky, or at times a babysitter is required. During the school year, Mrs. Parks would make sure Becky gets to school on Wednesday, Thursday and Friday, while on Monday and Tuesday, one Pauline Monroe, a neighbor and good friend of the Kimbells, would see the child off to school and drive her if the weather required.

Robert and Nancy Kimbell are both in the banking business but their working hours have had no adverse effects on the care and upbringing of Becky during her stay with them. On Sunday, while Mrs. Parks works, the Kimbells spend all day with Becky and take her with them wherever they go.

Mrs. Parks' relationship with her daughter has been one marked by genuine love and affection and the two appear to relate well to each other. The mother has been

persistent in fostering Becky's education from the very beginning, often reading to her and providing her with educational facilities. Mr. Kimbell testified:

> Mostly in the beginning, when Becky could, Joan [the mother] would read a lot to her in the beginning. Becky was very receptive. She bought her flashcards with letters, numbers and pictures and the child is very intelligent. She caught on well and enjoyed doing it. She spent a lot of time with that. She reads better than I do, sometimes, and I have even played games with Becky where she has beat me and I think basically this is due to a lot of the time that Joan has spent with her and has, you know, gotten Becky's interest in this. R.R. 66a–67a.

With a large home and three adult incomes providing support, Becky is well loved and cared for and has all of her physical needs satisfied in her Georgia home.[3]

During Becky's stay with her father in the 1978–9 school year, the two resided in Mr. Parks' one bedroom apartment in Kennet Square. At the hearings below, much was made of the fact that Mr. Parks sometimes slept in the same bed with his seven year old daughter, an arrangement which appellant found very unsuitable. Mr. Parks stated that such incidents were infrequent and were occasioned by his daughter asking him to stay with her until she fell asleep. At all other times, the father insisted, he slept on the sofa. However such conduct may reflect on the home environment provided by the father, it is now irrelevant

---

**3.** We are not convinced, as was suggested by the court below, that Mrs. Parks' action in taking Becky back to Georgia in July, 1979, without notice to the father, reflects adversely on her fitness as a parent. Considering the heated argument in the father's apartment on July 15, 1979, his demand that the mother never see Becky again, and the surprise to Mrs. Parks upon learning the true nature of the "agreement", we think there are considerable mitigating circumstances to lessen the culpability of her conduct. *Pamela J. K. v. Roger D. J.*, supra, 277 Pa.Super. 579, 419 A.2d at 1310. While we stress that we frown on unilateral abductions and do not approve of Mrs. Parks' actions, we merely note that her fitness as a parent is not seriously eroded thereby. Moreover, the mother's immediate filing of a petition for custody in Pennsylvania exhibits the respect for the legal process which our cases encourage. *In Re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978).

since Mr. Parks has since moved to a more spacious, two-bedroom apartment. Becky would now have her own room. The court should weigh the present capabilities of the parties to provide the child with a stable atmosphere and not dwell on past conduct, except insofar as the child's welfare is likely to be affected. *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974). There has been no evidence suggesting the father's past sleeping arrangements have had an adverse impact upon Becky's well-being.

Mr. Parks is employed as a sheet metal worker in the auto body field. His normal working hours are 8:00 a. m. to 5:00 p. m. five days weekly. During the school year, Mr. Parks drives Becky to a babysitter each morning and then proceeds to work. This babysitter is the same woman Mrs. Parks used during the term of the marriage and sees to it that Becky catches the school bus. This procedure is reversed in the afternoon, with the father picking Becky up about 5:30 p. m. During the summer, while her father works, Becky spends the day with Mr. Parks' sister, Donna Ifert.

Up to this point, Becky's friends while living with her father have consisted of cousins and close relatives. Mr. Parks takes Becky to visit the maternal grandmother very frequently. The child's home environment has been a happy one. Mr. Parks assisted Becky in her homework during the school year and enrolled her in Saturday ballet classes. During the summer, she also took swimming lessons and participated in the arts and crafts offered at the area playground. The appellant-mother does not question Mr. Parks' overall fitness to care for the child, aside from his occasional tendency to spoil her and buy her things beyond her needs. Mrs. Donna Ifert, the paternal aunt, testified that she is willing and able to help her brother in raising the child and assumed a great deal of responsibility for Becky during the summer of 1978. From this record, we may conclude that Mr. Parks exhibits genuine love and affection for Becky and is able to provide all of her basic needs throughout her early years.

■ At the conclusion of the hearing, Becky was asked in chambers as to her preferences. She stated she wished to live with her mother but could advance no reason for her decision. We have held that a child's preference, although not controlling, is a factor to be considered so long as it is based upon good reasons. *Husack v. Husack*, 273 Pa.Super. 192, 417 A.2d 233 (1979); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978). "In assessing the weight to be accorded the child's preference, [her] intelligence and maturity are to be considered with increased weight being accorded the preference as the child grows older." *Husack* at 235. Where no reason, or a very inadequate reason for the preference is given for the child's choice, we have given no weight thereto. See, e. g., *McCourt v. Meyers*, 268 Pa.Super. 152, 407 A.2d 875 (1979); *Trefsgar*, supra. Moreover, where the child is particularly young, we have found his or her expressed preferences not to be the "mature and intelligent" decision which should sway a court. See, e. g., *Pamela J. K.*, supra (age 8); *Gunter v. Gunter*, 240 Pa.Super. 382 n.2, 361 A.2d 307 n. 2 (1976) (age 7). Similarly, in the instant case, considering Becky's inability to articulate a reason for her decision and her age at the time (6½), it is safe to say that we have accorded her preference no weight in reaching our decision. Cf. *Palmer v. Tokarek*, 279 Pa.Super. 458, 421 A.2d 289 (1980).

■ As we have stated, the lower court seemed to emphasize and give effect to the 1979 agreement between the parties granting permanent custody to the father and found that Mrs. Parks had voluntarily signed the document. First of all, we have held that the court is not bound by a contractical agreement between the parties relating to custody. *Jon W. W. v. Brenda K.*, 279 Pa.Super. 50, 420 A.2d 738 (1980); *In Re Custody of Neal*, supra; *Commonwealth ex rel. Veihdeffer v. Veihdeffer*, 235 Pa.Super. 447, 344 A.2d 613 (1975). Second, undisputed testimony established that Mrs. Parks never had an opportunity to even see the agree-

ment until her husband was driving her to the airport to catch a plane for which she was already late. Mr. Parks admitted that although he had the written document in his possession for the entire previous week, he chose not to show it to his former wife and did not ask for her signature until the drive to the airport for her return home. Thus, without an opportunity to calmly read and reflect upon what she was signing and without consulting counsel, Mrs. Parks signed the document. We cannot agree with the lower court that the instant situation is one where a parent has "voluntarily" relinquished custody of a child. Finally, the agreement itself recites that the purpose of the transfer of custody was to permit Becky to enter first grade in Pennsylvania. Both parties stated that the document would clothe Mr. Parks with legal authority to make decisions for Becky's welfare, e. g., medical treatment, while she remained with him. In view of the language of the instrument and the circumstances surrounding its execution, we are reluctant to permit such a dubious document decide the future course of this child's well-being.

We find that we are faced with a choice between two parents who are deeply devoted to their daughter's welfare and are capable of providing "a suitable home and happy environment so vital to the maturing process of a young child." *McCourt,* supra, 268 Pa.Super. 162, 407 A.2d at 879. When confronted with such difficult choices in the past between two fine parents, we have found various factors to be decisive in tipping the scales one way or the other, such as the expanded availability of one of the parents to the child, *Neal,* supra, on the now-discarded tender years doctrine, *Davidyan v. Davidyan,* 230 Pa.Super. 599, 327 A.2d 145 (1974). Similarly, we have frequently stressed the importance of not disrupting an established and long continued relationship between a young child and one parent. "[W]here the child's parents are equally fit, or nearly so, the fact that a stable, long-continued and happy relationship has

developed between the child and one of the parents may be of critical importance." *Pamela J. K.*, supra, 277 Pa.Super. at 593, 419 A.2d at 1307 (1980). "The rationale for this concern is the child's initial need for stability in [her] early years and that, if a change is to occur, it should be in the later years when [she] has better control over [her] environment." *McCourt, supra*, 268 Pa.Super. at 162, 407 A.2d at 880. Thus, we have consistently avoided upsetting a young child's adjustment to a long and prevailing environment with one parent. *John M. W. v. Brenda K.*, 279 Pa.Super. 50, 420 A.2d 738 (1980); *Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979); *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976); *Sweeney v. Sweeney*, 241 Pa.Super. 235, 361 A.2d 302 (1976).

In the instant case, Becky's mother has quite clearly been the primary parental figure in the child's early life. For two years following the parties' separation in 1976, Becky remained with Mrs. Parks and she assumed total responsibility for her daughter's well-being during these pre-school years. Although Becky resided with her father for the 1978–9 school year, we do not view this period as defeating the fact that Mrs. Parks has provided the primary home for Becky up to this point. The mother-daughter relationship has been a sustained and happy one and no convincing reasons appear of record which would cause us to disturb it. Thus, in an effort to maintain the status quo and to ensure, to the greatest degree possible, more stability in the child's life, we think Becky's best interests must be in remaining with her mother. We will therefore reverse the order below and award custody to the appellant. Liberal visitation rights for the father are to be arranged by the parties on agreement. Failing such an agreement, the Court of Common Pleas, Chester County, is to enter such an order following a hearing. See, *Jon M. W.*, supra.

Reversed and Remanded.