361 A.2d 302
**Diane SWEENEY, Appellant,**
v.
**Edward SWEENEY.**

Superior Court of Pennsylvania.
March 28, 1976

236

[redacted]

Howard M. Goldsmith, Philadelphia, for appellant.

Edward J. Morris, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge.

This is an appeal from an order awarding custody of a six year old boy, Edward, Jr., to his father. Because the lower court's order made no provision for visitation by the mother, the record must be remanded.

I.

Edward, Jr., was born to appellee and appellant, who were husband and wife, on June 16, 1970. In the fall of 1971, appellee and appellant separated, with appellant retaining custody of Edward.[1] On December 22, 1972, appellee took Edward from the home of the babysitter who cared for Edward while appellant worked to his home in Philadelphia.[2] He then arranged to have Edward cared

1. Although both parties in their briefs refer to this arrangement as "custody," the record does not show that it was given formal sanction by the court.

2. In his brief, appellee suggests that he acted as he did because Edward had been left with the sitter while feverish and the sitter did not know how to reach appellant. Testimony about taking of Edward was offered at a hearing of June 5, 1973. However, we have been unable to obtain the transcript of that testimony from the hearing judge.

for in a day care nursery center during his own working hours.

On January 16, 1973, appellant filed a petition for a writ of habeas corpus in the Philadelphia Court of Common Pleas. A hearing was held on February 27, 1973. The hearing judge issued a temporary order granting appellant visitation but refused to decide the issue of custody until the homes of both parents had been investigated. Further hearings were held on June 5 and 12. Appellee testified that he had enrolled Edward at the day care center, and the judge ordered an investigation of the center. It was also brought out at the hearings that a male friend of appellant stayed overnight during Edward's visitation. The judge against refused to decide the issue of custody, but at his urging it was agreed that Edward would live with appellee from Sunday evening through Friday morning and would continue to attend the day care center, and that appellant would pick Edward up at the center on Friday afternoon and return him to appellee Sunday evening.

On November 27, 1973, appellant's petition for habeas corpus and a petition that appellee be held in contempt for failure to abide by the order of June 12 were heard, with a further hearing on November 30. The evidence showed that a female friend of appellee stayed overnight while Edward was in appellee's care. For the third time, the judge refused to decide the issue of custody, instead entering the following order, referred to by both parties in their briefs as "split visitation:" [3]

By agreement: Father is to pick up child from Sunday 6 p. m. to have child until Friday. Mother will pick up child from Day Care Center on Friday afternoon and will have the child until Sunday evening until 6 p.

3. *See* Appellant's Brief at 6, Appellee's Brief at 3. We have recently discussed the need to clarify our terminology in visitation and custody cases. *Scott v. Scott*, —— Pa.Super. ——, 356 A.2d 366 (filed 4/22/76) (concurring opinion by Spaeth, J., joined by Hoffman, J.)

m. at which time father will pick up child from mother's residence. This formula schedule and time schedule will continue. On Christmas mother will have child all day 12–23–73, 12–24–73 (12–25–73) until 12:00 noon on 12–25–73 at which time father will pick up child from mother's residence and will have child until 12/29/73 at 6:00 p. m. At that time he will return child to mother's residence. In addition it is the Order of this Court that at no time shall the child be in the same room or presence of either Frank Michner [*sic*] during the time child is with mother or Carol Spear during the time child is with father. Review in four months from the date hereof at the request of either party or counsel.

On July 23, 1974, pursuant to the provision for further review, counsel for appellant wrote the judge, asking that he hear the petition for habeas corpus and make a final award of custody. In response, counsel was advised that the judge was no longer sitting in the Domestic Relations Division, and that it would therefore be necessary for another judge to hear the case. The judge to whom the case was then assigned, and from whose order the present appeal is taken, noted that the case would take all day, placed it on a special list, and heard testimony on December 18, 1974, almost two years after Edward had been taken by appellee. By this time, the parties were divorced, appellant had married the male friend who had stayed overnight with her, and appellee the female friend who had stayed overnight with him.

The December 18 hearing was extensive. Both parties testified, as did three witnesses for appellee and appellee's new wife. The judge interviewed Edward, then 4½ years old, in chambers, without the presence of counsel for either side and without a court reporter. He interviewed Edward for a second time on January 16, 1975, again without counsel present and without a court reporter. On April 30, 1975, a further hearing was held,

so that appellant's new husband and two additional witnesses might testify. The judge then entered the following order:

AND NOW, this 7th day of May 1975, after hearings had and testimony heard, the Court awards custody of EDWARD SWEENEY, minor to his father, EDWARD SWEENEY.

The judge entered no order regarding visitation by appellant, nor does his opinion make any mention of visitation.

Appellant filed this appeal on May 22, 1975. On June 5 she obtained a supersedeas from this court, staying the award of custody and permitting her to retain the visitation rights granted her by the order of November 30, 1973.

## I.

This court has said, most recently in *Gunter v. Gunter*, —— Pa.Super. ——, 361 A.2d 307 (filed 3/29/76), that "in a child custody case two requirements must be satisfied: the record must be complete; and the hearing judge must by his opinion give us the benefit of a thorough analysis of that record. If these requirements are not satisfied, the judge's order will be reversed . . ." *Id.* at ——, 361 A.2d at 307. *See also Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974); *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 29, 312 A.2d 58 (1973). Here, these requirements have been only partly satisfied.

Except in one respect, which will be mentioned in a moment, the record is complete. Three hearings were held before the first hearing judge; the second judge devoted more than a full day to the case, and heard testimony from both parties and their spouses. In addition to the testimony noted *supra*, the judge considered the report of a psychiatrist's examination of Edward (Record

at 24b–25b) and a lengthy letter from the Educational Supervisor of Edward's day care center (Record at 26b–27b). The financial support available from both parents and the physical arrangements in both homes were thoroughly explored.

The one respect in which the record is not complete was that Edward's testimony in the judge's chambers was not transcribed. In *Gunter v. Gunter, supra,* we pointed out, collecting the cases, that this was error—error, moreover, that could not be waived.

Despite this error, there was enough information to enable the hearing judge to file a "a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster, supra,* 226 Pa. Super. at 327, 312 A.2d at 63. However, the judge did not file such an opinion. Instead, he appears to have relied almost exclusively on the unrecorded testimony of Edward. Thus he says:

> The child was interviewed alone in chambers, counsel having waived their right to be present. Although dealing with a young child, the Court was impressed by Edward, Jr.'s emotional and intellectual maturity. He expressed happiness and great satisfaction in living with his father and the new Mrs. Sweeney. Although he realizes that his stepmother is not his mother, he calls her "Mommy." He has in all respects made a fine adjustment to the new domestic situation . . . . The interview reflected Edward Jr.'s desire to continue with his father with whom he so closely identifies.

Opinion at 1, 3.[4]

4. The judge conducted the following colloquy with counsel for both parties before conferring with Edward in his chambers:
MR. GOLDSMITH (attorney for appellant): . . . . I understand from the law on this matter, Your Honor, correct me if I'm wrong, that counsel has a right to be present when Your Honor speaks to the child.

The opinion suggests only one other factor as a possible basis for the decision, *i. e.*, that in appellee's home Edward would have his own bedroom:

> In considering the living conditions of both parties, the Court feels that the Sweeney Household is in many respects superior to the Michener home. Although both parties maintain fine homes, the Sweeney's [*sic*] provide a bedroom used by Edward, Jr. only. Although there was evidence presented that Edward, Jr. also had a bedroom at the Michener home, evidence also indicated that Mr. Michener's other children often shared the bedroom with Edward, Jr.

We cannot say that this opinion reflects a "thorough analysis of the record."

■ This leaves us in a difficult position. On the one hand, we might remand. As noted in *Gunter* the failure to transcribe a child's testimony is not to be condoned; and if we are to discharge our responsibility of review, it is imperative that we have the benefit of a full opinion by the hearing judge. Still, procedural considerations

THE COURT: That's not my understanding. I want to speak to the child alone.
MR. GOLDSMITH: Okay.
THE COURT: Do you have any objection to me speaking to the child alone?
MR. GOLDSMITH: No, Your Honor.
MR. MORRIS (attorney for appellee):
Well, I'd like it part of the record, Your Honor, just part of the record that both counsel, if the Court agrees to speak to the child alone, both counsel would at this time waive any objection to that on the record because at a later time I don't want it raised as an objection that the Court spoke with the child in the absence of counsel. . . .

. . . . . . . . . .

THE COURT: I don't think the child could be free to really express what he wants to do. Now, unless there is some question about whether or not I'm going to truly represent—I'll be very frank; let the record show it—whether I'm going to truly represent what I found, then you should have objected to my hearing the case in the first place.
MR. MORRIS: No.
MR. GOLDSMITH: Absolutely not, Your Honor, Absolutely not.
THE COURT: Okay.

must not be accorded too much weight. Thus in *Gunter* we noted that

> It is arguable that for the sake of clarity we should announce a prophylactic rule that the failure to transcribe a child's testimony will by itself result in remand; certainly the failure is not to be condoned. So far, however, our cases have only gone to the point of ordering remand where given the failure to transcribe the child's testimony, the record is too incomplete to permit us to discharge our responsibility to exercise "the broadest type" of review. [Citations omitted]. *Id.* at ——, 361 A.2d at 307.

Here, we have concluded, the record is ample, even without Edward's testimony, to permit us to conduct the comprehensive review our cases require. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1973); *Commonwealth ex rel. Ulmer v. Ulmer, supra.*

## II.

■ The evidence showed that appellee was familiar with and interested in Edward's daily routine, was conscientious about Edward's health, and actively consulted with the supervisor at the day care center. When asked by the hearing judge: "Do you ever make inquiries conconcerning the child? What do you do? appellee responded:

> I ask how he's been eating, if he's taken a nap, if he's been playing, any problems, does he have any problems with kids, the children in the school, if he's, you know, obedient, if he seems happy and everything. I check up on those things and if he is, like, may have a slight cold or something like that during the day, I will call to find out how he's doing. If he has any problem, or if he does, I'll go up and pick him up.
>
> N.T. 76.

In contrast, appellant, who, under the terms of the November 30, 1973, court order, had Edward every weekend, did not show the same interest in his everyday affairs. Thus when asked on cross-examination, "Have you ever had any interviews in the past year with anyone personally at the Wee Day Care Center inquiring as to Ed's status?" she answered:

> I've talked to Mr. B. That's what the kids call him, Mr. B.
>
> Q. Mr. G.?
>
> A. Or Mr. G.
>
> Q. Not Mr. G., it's—
>
> A. I just call him Mr. B.
>
> Q. Do you know his full name?
>
> A. No, I don't remember.
>
> .    .    .    .    .    .    .    .
>
> Q. Do you know the names of any of the personnel at the Wee Day Care Center?
>
> A. No.
>
> Q. Have you ever made any attempts to visit the Wee Day Care Center to speak with anyone concerning Ed's progress and how he's doing?
>
> A. I've just talked to Mr. B. a few times.
>
> Q. You mean Mr. G.
>
> A. Mr. G., sorry.
>
> Q. I see. On the telephone?
>
> A. No, when I've gone to pick Eddie up.

N.T. 30–31.[5]

---

5. In fairness to appellant it should be noted that she indicated that she felt under some constraints:
> Q. During the day, have you ever made an attempt to go over there [the day care center] to spend any time at the Wee Day Care Center with Ed?
>
> A. No, I'm not allowed to. It's not in the court order.
>
> Q. I see. But you have made no attempt upon your own.
>
> A. I went one time early to go pick my son up.
>
> N.T. 32.

Mr. Goldiner, the day care center's Educational Supervisor, submitted a detailed report on Edward's progress to the Family Court. His evaluation was positive; he used phrases such as "excellent adjustment," "happy and contented child," "sociable and well-mannered," etc. Record, 26b–27b. His report contains the following comments about Edward's relationship with his parents:

> Edward's relationship with his father is apparently excellent; the rapport between them is obvious. (His relationship with Mrs. Sweeney also seems to be very good.) Edward responds with enthusiasm when his father comes for him; and he is always proud to relate his progress to him. (Edward responds in a similar way to Mrs. Sweeney.) Both are patient and supportive.

> Our observation and/or evaluation of how Edward responds to or relates to his mother is minimal. This is because she only comes on Fridays. At these times, mutual affection is demonstrated . . . Our contact with her is minimal. These Friday encounters are brief. Our conversations have never been lengthy. While she has not made any formal inquiries, she has asked how he was doing.

Record at 27b.

This and similar evidence throughout the record persuades us that the hearing judge's conclusion that Edward had "made a fine adjustment to the new domestic situation," was correct.

We recently said that "[t]here has been increasing attention, both by the courts and in the psychiatric and psychological literature, to the importance in custody cases involving young children, of not disrupting an established relationship." *Gunter v. Gunter, supra* at ——, 361 A.2d at 307. Here, Edward has been with appellee for almost 2½ years. The testimony showed that he is

happy and well-adjusted in that situation.   On balance, then, we see no reason to disturb the award of custody.[6]

## III.

■ Rather than converting the order of November 30, 1973, into an order granting custody to appellee and visitation rights to appellant, the lower court appears to have overlooked appellant's visitation rights entirely; its order, as will have been observed, contains no mention of visitation.   This is not a case where visitation might properly be denied; we have often said that may be done only when it is shown that visits would be detrimental to the child.   *Commonwealth ex rel. Lotz v. Lotz,* 188 Pa. Super. 241, 146 A.2d 362 (1959); *Commonwealth ex rel. Heston v. Heston,* 173 Pa.Super. 260, 98 A.2d 477 (1953). No such showing has been made.   To the contrary, the record suggests that an extremely liberal grant of visitation to appellant would be appropriate.[7]

---

**6.** In her brief to this court, appellant argues that the so-called "tender years presumption" requires that she be given custody of her child.   It is well-settled that in custody cases the best interests of the child are the paramount consideration. *Commonwealth ex rel. Parikh v. Parikh,\* Commonwealth ex rel. Holschuh v. Holland-Moritz, supra.*   We have said that the tender years presumption will only come into play where the evidence is so evenly balanced as to favor neither parent, noting that "[s]uch cases will be rare."   *Commonwealth ex rel. Grillo v. Shuster, supra.*   226 Pa.Super. at 236, 312 A.2d at 612.   *And see Commonwealth ex rel. Parikh v. Parikh, supra; Commonwealth ex rel. McLeod v. Seiple,* 193 Pa.Super. 131, 163 A.2d 912 (1960).
\* 449 Pa. 105, 296 A.2d 625 (1972).

**7.** As noted in footnote 1, *supra,* appellant cared for the child for approximately one year following the parties' separation.   She has made repeated efforts to regain custody, always proceeding by application to the lower court.   The lower court's delay in arriving at an adjudication may have contributed to Edward's adjustment to and close relationship with appellee.   Although appellee suggested in his testimony that appellant and her new husband took Edward to a bar, N.T. 78, there is nothing in the record to suggest that Edward's welfare would be served by preventing appellant from seeing him often.

246

The record is remanded for further proceedings consistent with this opinion.

WATKINS, President Judge, concurs in the result.