409 A.2d 1178

**Paul J. KIMMEY, in his own right and Heather Kimmey and Brian Kimmey, by Paul J. Kimmey, their natural father, Appellants,**

v.

**Theresa Register KIMMEY.**

Superior Court of Pennsylvania.

Argued March 21, 1979.

Filed Sept. 7, 1979.

Mark B. Dischell, Lansdale, for appellants.

Edward J. Hollin, Lansdale, for appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

348

SPAETH, Judge:

This is an appeal by a father from an order denying his petition for custody of two minor children, Heather, age four, and Brian, age two and one-half, and granting custody to their mother.

Paul and Terri Kimmey, the parties herein, were married in May, 1973. Mr. Kimmey left the marital home in August 1977, but returned in November of that year. The parties continued to live together until August 3, 1978, when Mrs. Kimmey, after a violent argument with her husband, took the children and left home. Mr. Kimmey filed a petition for custody, and a hearing was held on September 18, 1978.

Mr. Kimmey, a twenty eight year old college graduate, was residing in the marital home at 343 West 5th Street, Lansdale, at the time of the hearing. He was employed and earned approximately $11,000 per year. Mrs. Kimmey was employed as a manager in a local restaurant. She and the children were living in a three bedroom condominium with Nadine Dalrymple and Mrs. Dalrymple's husband and child at the time of the hearing.

Mr. Kimmey testified at the hearing. His testimony was that his wife did not properly supervise, bathe, or care for the children, was not affectionate with them, and cursed at them. He also said that on several occasions she had forgotten to give Brian his daily medication to control his mild epilepsy.

Dr. Wesley Sandler, a psychologist, testified that he had examined Mr. Kimmey and the children and had found Mr. Kimmey to be a responsible individual who was concerned with his children. He further testified that he had performed psychological testing upon Heather and from these tests determined that she best related to her father. However, Dr. Sandler had not tested Mrs. Kimmey and had no basis for comparing the relative fitness of both parents.

Mrs. Ellen Piltz, a next door neighbor, testified that she had known both parties for approximately three years. She said that when Mr. Kimmey was taking care of the chil-

dren—he took care of them for a period when he was unemployed—they were kept clean and were well supervised but that when he left the home during the separation and the children were with Mrs. Kimmey alone, they were not well supervised [1] and were dirty. In describing what she

1. Mrs. Piltz testified:

Q. Mrs. Piltz, have you had occasion to observe the raising of the Kimmey children by both Mr. and Mrs. Kimmey?

A. Yes, I have.

Q. Can you make any observations regarding the children's supervision?

A. As to which one?

Q. Well, first as to Mr. Kimmey.

A. Yes. They were well supervised.

Q. At what time?

A. When he was home.

Q. Well, when you say well supervised, can you elaborate for us?

A. When they would be outside playing.

Q. What would he do?

A. He would sit out there with them, watch them, play with them, take them to the playground. They were not allowed on the playground by themselves.

Q. How about when Mrs. Kimmey had the children by herself? Can you make any observations regarding her supervision?

A. There were numerous times when the children were outside that Mrs. Kimmey was not around. She was inside.

Q. Can you specify any of these incidents?

A. Yes. There was one time when Brian would stand on the top of the wooden deck. He would stand on the top rail. And I called to her and there would be no response. And finally I would have to tell Brian to get down because I was afraid he would fall.

Q. Was there ever a time when Brian did fall?

A. Yes.

Q. Can you describe exactly what happened on that occasion?

A. On one occasion Mrs. Kimmey came over to my house with Brian in her arms. Apparently he had fallen out of the crib. She asked me if I thought he might have a concussion. I said, "I don't know. Call the doctor." She stated that she didn't want to call the doctor and she took him back home.

I proceeded out back where my children were playing, and five minutes later Brian was out back. She was standing there. Brian was standing on the top of the cement steps, on the edge. And I said to her, "Terri, Brian is going to fall." She turned around in a nonchalant way and there goes Brian right down.

Q. Did he hurt himself this time?

A. He fell on cement. He fell off the top of a three-step structure.

Q. Where did he land? On his head?

A. This way (indicating), yes.

Q. Let the record indicate that this way means sideways.

A. I'm sorry, yes.

meant, she said that the children's clothes were always food-stained and that they themselves were unwashed. Heather's hair, according to Mrs. Piltz, was filthy and her diapers were rarely changed and were overflowing with feces.[2]  She also testified that the children were more affectionate with their father than with their mother;  that the mother often had male visitors stay overnight;  that the

Q.  Did he cry at that time?
A.  Yes, he did.
Q.  Now, how would you characterize Mrs. Kimmey's supervision of the children?
A.  Very poor.

N.T. 66a–68a.

2.  Mrs. Piltz testified:

Q.  Now, regarding cleanliness, when Mr. Kimmey was taking care of the children and living at home were the children clean?
A.  Yes.
Q.  Can you describe?
A.  Children will get dirty, but they were always washed up and cleaned.  Their clothes were clean.  Their hair was clean.
Q.  Now, how about when Mrs. Kimmey had the children alone, were the children clean?
A.  No, they were not, sir.
Q.  Can you elaborate on that?
A.  Yes, sir.  Their clothes were always food-stained.  And it is not from being washed.  I have food stains that when you wash they don't come out.  But this was definitely food stains that had not even been washed.  Their hair was filthy.
We have a cyclone fence and Heather would stand on the step of the deck and go like this (indicating) to look into my yard at my dog and my children, and her scalp would be filthy.  Back here (indicating) would be all brown, behind her ears.
Q.  Was this a frequent occurrence?
A.  Yes, it was.

                    *      *      *      *      *      *

Q.  How about the children regarding their toilet habits?  Can you make any observations regarding that?
A.  Yes.  Heather was not potty trained and she was over three years of age.
Q.  Do you know anything else regarding Heather's alimentary habits?
A.  I have witnessed Heather's diapers full of feces, hanging saturated, hanging on them, and Terri made no move to change them.
Q.  Did you ever see the fecal matter hanging from the children's diapers when Mr. Kimmey was living at home?
A.  No, I did not.

N.T. 68a–69a, 74a.

mother did not properly feed [3] or discipline the children; and that the mother did not keep a clean home.

Caterina Messina, a fifteen year old neighbor of Mr. Kimmey, also testified. She said that she had known both parties for approximately three years and was friendly with both of them. Her testimony was similar to Mrs. Piltz's with respect to Mrs. Kimmey's failure to keep the children or the house clean. She also said that she had seen at least one man stay overnight with Mrs. Kimmey and that the very next day Heather had told her that "last night my mother's friend sleep over and sleep in my mother's bed and she sleep in my bed because my mother's bed was broken." N.T. 88a.

Carol Clelland, another neighbor, testified that she baby-sat Heather and Brian for approximately eight months during the parties' two separations. Her testimony was also unfavorable to Mrs. Kimmey. According to Mrs. Clelland:

Q. How about taking care of the children? Did you see Mr. Kimmey take care of the children?

A. Yes, I have.

Q. How does he take care of them?

A. They are always clean. Their hair is combed. He cooks out a lot on the grill. I thought he took very good care of them. He gave them baths, you know. I knew they were clean when he had them.

Q. How about when he didn't have them, what happened?

---

**3.** Mrs. Piltz testified:

Q. How about feeding the children? Did you ever observe Mr. Kimmey cook for the children?
A. Yes, I have.
Q. What were the components of his meals? What would he cook for them, if you did not understand my first question?
A. Chicken and steak and hamburger. Substantial meals, like I feed my family.
Q. How about Mrs. Kimmey? Have you ever seen her feed the children?
A. The only thing I have seen Mrs. Kimmey give the children is candy, cookies or marshmellows, hoagies and pizzas.
N.T. 73a.

A. Well, I was watching the children when they were separated, and I would have—

Q. You said you were watching. Were you baby-sitting for the children?

A. Yes, I was. I was baby-sitting when they were separated. This is the first time. Heather and Brian would come to my home in the morning about seven o'clock. Old diapers were still on them from the night before.

Dirty shirts from the day before. She would never wash them up or anything, before they got to my house. I would feed them breakfast. And then I had occasion to have to give them baths and I would find that scum on the back of their neck. The head would be like brown, almost like mud, built up scum on their scalp.

\*  \*  \*  \*  \*  \*

Q. How about food, Mrs. Clelland?

A. Well, I fed them their breakfast when I watched them. And I fed them their lunch. I had an occasion to talk to Terri while I was watching them, when they were separated, and she told me that since he was gone—

Q. Who is he?

A. Mr. Kimmey. Since he was gone I don't have to cook anymore. I am giving them pizzas and hoagies for dinner. And she worked at a pizzeria at the time. So that I heard her say myself. I felt bad so I was giving them hot lunches because I felt they were not getting, you know, the proper nourishment.

Q. Did you make any observations or was anything told to you by the children regarding their breakfast?

A. Well, Terri told me herself, when they were separated the second time, that she couldn't get up in the morning, so Heather would go downstairs—

Q. Why couldn't she get up?

A. Because she was working so late that she couldn't get up the next morning. So Heather would go downstairs and get a paper plate for her and Brian, put cereal on the paper

plate, milk, and they would eat cereal from a paper plate. So then she said they were making a mess so she told Heather to go in the dishwasher and get cereal bowls out and then they could make a bowl of cereal nice and neat without getting it all over.

Q. Mrs. Clelland, how old was Heather at this time?

A. Heather was three.

Q. She was making breakfast for Brian at age three?

A. Yes.

Q. Now, as far as affection is concerned, do you have any observations regarding the children's affection?

A. Yes. When Terri would leave them off in the morning she would say, how about giving mommy a kiss? Brian wouldn't go near her and Heather would run up in the playroom to play with my son. They didn't want to. I would say that nine times out of ten they would run away from her. Every once in a while they would say good-bye, but they would not run to her.

Q. How about as to Paul?

A. With Paul, he came to pick them up at night and they would run to him and tell them what they did at the playground. They would hug him and kiss him and get all excited over him. One time, when they were separated, I put Heather up in the back bedroom to take a nap, and she saw Mr. Kimmey pull into their driveway, and she became hysterical. She was screaming, daddy, come and get me, I am up here, come and get me. She wanted her father. At that time I couldn't do anything about it. I closed the window and made her go back to bed. I couldn't, you know, call him over, or anything.

Q. Now, Mrs. Clelland, while Mr. Kimmey was away, while the parties were separated, on occasion did Mrs. Kimmey have overnight male visitors while the children were in the house?

A. Yes.

Q. Can you describe these occasions?

A. Yes. One morning I went out to get my milk about six-thirty, and a bearded man was leaving. And I had seen him go in the night before. I don't really know what time it was but I saw him go in the night before. His car was parked in the back. I'm sorry, his car was parked in the front. I'm sorry. And when she came over to drop the kids off she made a big joke about it. And she said, "Oh, the neighbors are really talking now. They saw somebody leave. But he just came over this morning for coffee."

And that's the day that Heather said, "Carol, mommy had a friend named Owen stay over last night. He slept in my bed."

Q. And the second time?

A. The second time she told me that a man named Bob stayed over.

\* \* \* \* \* \*

Q. Now, did you ever observe the Kimmey grass, the Kimmey yard?

A. Yes. They had a dog. When Mr. Kimmey was home, every single day that he got home from work he would shovel up the dog manure off the lawn, and I have yet to see Terri pick up a shovel and pick it up. It would be piled all over.

Q. Did you ever see Mrs. Kimmey clean the yard?

A. Never. Never emptied the trash bags, never cleaned the yard, no.

Q. Was there a good bit of trash left over when Mrs. Kimmey left the residence in August?

A. When Terri left Paul carried out twenty-five bags of trash.

Q. How come you know the exact count?

A. Because we all went out and counted it. There was so much trash. We couldn't believe there was so much trash out in the yard.

Q. Other than what you have described, do you have any other observations regarding the children's clothing?

A. Just that it had food stains on it when he was not there. He did the laundry. I saw him every Sunday with the laundry basket because his washer was broken. He went to his mother's every Sunday with the laundry basket full of clothes, and I had occasion to walk in when Terri was home and Paul would be cooking in the kitchen.

Q. When Terri was home and Paul was not there, what was the house like?

A. It was dirty. They have a dark rug in the living room, I think, and there were crumbs, cereal, pieces of paper, clothes all over the chairs, and the kitchen would have dishes in the sink, the table would be full of leftovers, you know, food from the meal before.

N.T. 94a–101a.

Mrs. Kimmey's eighteen year old niece also testified on behalf of Mr. Kimmey. She said that she babysat the children on several occasions for Mr. Kimmey and that when she was at the Kimmey home it was a mess, full of dirty diapers and food scraps. She also said that on one occasion Mrs. Kimmey had allowed her to babysit the children when she was visibly intoxicated and in no condition to watch over them.

Mrs. Kimmey testified in her own behalf. She described in some detail the argument that precipitated the second separation. She also said that her husband had kept marihuana in the bedroom against her wishes and that he had told her that he would not fight over custody of the children if she would give up her half of the jointly owned house. She also said that he had threatened to take the children and run away with them to Canada or Australia. She disputed the testimony of her niece and her former neighbors with respect to the cleanliness of the house and the children and her supervision and care of them. She also denied that she had any overnight male visitors.

Nadine Dalrymple and Mrs. Kimmey's father and brother also testified in Mrs. Kimmey's behalf. Her brother, a former Philadelphia police officer, testified that Mr. Kim-

mey had once asked him the legal effect of a father's kidnapping his own children and leaving the state with them.

At the close of all the testimony the court awarded custody of both children to the mother but granted Mr. Kimmey visitation.

It is settled that the paramount concern in a child custody proceeding is to determine what is in the best interests of the child. *Sipe v. Shaffer*, 263 Pa.Super. 27, 34, 396 A.2d 1359, 1363 (1979). Both the lower court and the appellate court have certain duties in child custody cases. In *Lewis v. Lewis*, 267 Pa.Super. 235, 406 A.2d 781 (1979), this court described the respective duties of the lower court and the appellate court as follows:

> In order to ensure that the best interests of the child will be served, the appellate court will engage in a comprehensive review of the record. *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978); *In re Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976). Thus, while it will defer to the lower court's findings of fact, the appellate court will not be bound by the deductions or the inferences made by the lower court from those facts, but will make an independent judgment based upon its own careful review of the evidence. *Sipe v. Shaffer, supra; Scarlett v. Scarlett, supra.* In conducting this review, the appellate court will look to whether all the pertinent facts and circumstances of the contesting parties have been fully explored and developed. *See Sipe v. Shaffer, supra; Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). It is the responsibility of the lower court to make a penetrating and comprehensive inquiry, and if necessary, to develop the record itself. *See Commonwealth ex rel. Cox v. Cox*, 255 Pa.Super. 508, 388 A.2d 1082 (1978). After fulfilling this responsibility to ensure a complete record, the court must file a comprehensive opinion containing its findings and conclusions. *See Valentino v. Valentino*, 259 Pa.Super. 395, 393 A.2d 885 (1978); *Gunter v. Gunter, supra.* Only with the benefit of a full record

and full opinion can the appellate court hope to fulfill its responsibility of conducting its own careful review. *Valentino v. Valentino, supra.* Where the record is incomplete or the opinion of the lower court is inadequate, the case will be remanded. *See Valentino v. Valentino, supra; Commonwealth ex rel. Forrester v. Forrester,* 258 Pa.Super. 397, 392 A.2d 852 (1978); *Commonwealth ex rel. Cox v. Cox, supra.*

267 Pa.Super. at 240–241, 406 A.2d at 783–784.

In this case the lower court filed a three page opinion in support of its decision to award custody to Mrs. Kimmey. In its opinion the lower court's entire discussion of the evidence and the reasons for its decision was as follows:

Mrs. Kimmey left the marital domicile following a violent argument between the parties the night before. During the argument Mrs. Kimmey had locked herself in the room where the children were sleeping as she feared that Mr. Kimmey would harm her. Mr. Kimmey pushed in the door, picked up Brian and a suitcase and threatened to take the children away. Mrs. Kimmey attempted to call the police but was prevented from doing so by Mr. Kimmey. Finally she was able to get through and the police came to the house to calm the disturbance.

After the police left Mr. and Mrs. Kimmey attempted to discuss their problems but they were unable to resolve them and the argument continued. Mrs. Kimmey testified that she feared that her husband would carry out his threat to take the children away. Therefore, she left the next day with Heather and Brian.

At the time of the hearing Mrs. Kimmey and the children were residing temporarily at the home of friends, Mr. and Mrs. Dalrymple, located at 504 Bunker Hill Drive in Harleysville, Pennsylvania. Mr. Kimmey was living in the marital domicile at 343 W. 5th Street, Lansdale, Pennsylvania.

In the past Mr. Kimmey has demonstrated his ability to care for the children as he assumed those duties and performed the necessary tasks during a five month period

in 1977 when he was unemployed. However, Mr. Kimmey has threatened to remove the children to either Canada or Australia. Furthermore, his past behavior has proven that he has a violent temper, as most recently evidenced by his behavior the night before Mrs. Kimmey's departure.

Furthermore, Mrs. Kimmey asserted that Mr. Kimmey has repeatedly offered to abandon these custody proceedings if she would, in turn, agree to give up certain marital property rights. Mr. Kimmey, in rebuttal, said such overtures were made by Mrs. Kimmey. Credibility of the witnesses is a matter for the fact finder who has the opportunity to observe their demeanor and decide the weight to be accorded to their testimony. *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 248 A.2d 63 (1968). The court found Mrs. Kimmey more credible in this regard, thus reflecting adversely upon Mr. Kimmey's motions [*sic*; "motives"?] herein.

In the past Mrs. Kimmey has proven to be a responsible and loving parent in caring for her children. In addition she held two jobs during the period of her husband's unemployment in order to support her family. Mrs. Kimmey has impressed this Court as the more stable and responsible one of the two parents vying for custody of these two minor children.

With respect to the liberal visitation rights granted to the father, the Court gave the father the benefit of the doubt as to the alleged threats by him to remove the children to a place remote from the jurisdiction of this Court. He categorically denied making them, under oath. He has exercised his appellate rights rather than taking matters into his own hands. The Court trusts that he will continue to act responsibly in this regard.

Lower Court Opinion at 2–3.

■ The lower court's opinion cannot be called comprehensive. It only discusses the argument that occurred between the parties in August, 1978, and the testimony that Mr. Kimmey had tried to negotiate custody by having Mrs. Kimmey give up certain property rights and had threatened

to take the children to Canada or Australia. While the facts discussed by the court were very important, there was other important testimony that the court did not even mention in its opinion. The testimony of Mrs. Kimmey's former neighbors, babysitter, and niece with respect to her lack of care and supervision of the children and with respect to the fact that she never cleaned her house, her yard, her children, or their clothes, was very important, as was the testimony that she was not affectionate with the children, and had had several overnight visitors.

■ Perhaps the lower court did not believe the testimony offered by the niece, the neighbors, or the former babysitter. Mrs. Kimmey, and her witnesses, dispute it.[4] While decisions as to the credibility of witnesses are in the province of the fact-finder who heard their testimony and observed their demeanor, see *Jones v. Kniess*, 249 Pa.Super. 134, 375 A.2d 795 (1977), nevertheless if the lower court judge in a child custody case decides to disbelieve a witness or several witnesses who, as here, give damaging testimony, he should explain this in his opinion. As the record now stands we cannot tell if the judge attached any weight to any of this testimony, or whether he balanced it against what he considered to be the violent nature or improper motivation of the father and found it wanting.

■ In some cases where the lower court has failed to file a comprehensive opinion in a child custody case, a remand is unnecessary because the record is sufficiently complete and clear to decide which party should be granted custody even

4. Mrs. Kimmey attempted to demonstrate that Mrs. Piltz was prejudiced against her because she had distributed a petition to close down the West End Tavern while Mrs. Kimmey was working there. Nadine Dalrymple and Mrs. Kimmey's father and brother all testified that she kept the children clean and well supervised and that she was affectionate with them. Moreover, at one time during her marriage Mrs. Kimmey was working two separate jobs and thus perhaps did not have much time to care for the children. There was also testimony that her inability to get out of bed in the morning and to watch over the children was a temporary situation, which occurred in February, 1978, and was caused by her recovery from hepatitis and blood clots.

without the benefit of further explanation by the lower court. *See Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 204, 374 A.2d 1386, 1390 (1977); *Sweeney v. Sweeney,* 241 Pa.Super. 235, 361 A.2d 302 (1976). In those cases we decide the custody issue and do not remand the case for an opinion. *See Tomlinson v. Tomlinson, supra.*

In other cases where the lower court has failed to file a comprehensive opinion, this court has "referred the case back to the judge for further review so as to preserve both the rights of the parties to have their case decided by the trier of fact and the interest of the Commonwealth in the welfare of the children, and to allow this court to exercise the 'broadest type' of review." *Tomlinson v. Tomlinson, supra* 248 Pa.Super. at 204, 374 A.2d at 1390. *See Commonwealth ex rel. Forrester v. Forrester,* 258 Pa.Super. 397, 392 A.2d 852 (1978); *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974); *Augustine v. Augustine,* 228 Pa.Super. 312, 324 A.2d 477 (1974); *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973). Thus in *Grillo* this court remanded the case for further proceedings, saying that "[t]he transcript reflects important facts not mentioned in the hearing judge's opinion. It is therefore impossible to evaluate how much weight those facts were given, with the result that there cannot be an intelligent appellate disposition." 226 Pa.Super. at 237, 312 A.2d at 63. And in *Forrester* we remanded for a comprehensive opinion by the lower court because the "court below, which heard the testimony and observed the witnesses, has not treated many of the relevant factors in its opinion." 258 Pa.Super. at 400, 392 A.2d at 854.

Here the case must be remanded. Absent some further explanation by the lower court, we cannot determine from the record the weight it gave to the testimony of the former neighbors, babysitter, and niece, or whether it considered this testimony at all, and we shall not attempt to decide the issue ourselves without an evaluation by the lower court of this testimony and a discussion of how the evidence against Mrs. Kimmey balances against the lower court's finding that

there may have been some improper motivation on the part of Mr. Kimmey.[5] While the present record may provide a sufficient basis for a comprehensive opinion, we do not limit the ability of either party to request, or the lower court's discretion to require, a further hearing if that would be desirable. *See Commonwealth ex rel. Forrester v. Forrester, supra.*

Reversed and remanded.

5. By remanding we in no way intimate that the decision of the lower court was incorrect, or that it was correct. We only hold that the fact that the lower court here failed to discuss certain significant testimony prevents us, on appeal, from performing our duty to conduct the full and careful review required in cases involving child custody.