411 A.2d 234

**Dennis J. McCANN**

v.

**Carol Ann McCANN, Appellant.**

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed Sept. 28, 1979.

Winifred H. Jones-Wenger, Philipsburg, for appellant.
Michael Bresnahan, State College, for appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal by a mother from an order granting a father's petition for custody of the parties' minor son, Brian.

The parties were married in 1974 and separated in 1976. Brian was born in May, 1976, after the separation but before the parties' divorce in July, 1976. The mother had custody of Brian and she took him to live with Ed Smith, her boyfriend. Her relationship with Smith was not a very happy one; there were frequent arguments, and sometimes the mother was physically abused. Brian was not abused, however; in fact, there was evidence that Smith treated Brian very well.

In November, 1977, when Smith's abuse of her had become intolerable, the mother took Brian to live with the father's parents, Mr. and Mrs. Joseph McCann, at their home in Julian. Brian remained with the McCanns from November 19 to November 30. On November 30 the mother took Brian to live with her at her mother's hotel and bar, the Reed House in Osceola Mills. She soon had to leave her mother's apartment, however, because of her mother's complaints about her relationship with Robert Earnest. On December 7 Brian was returned to the McCanns, and he remained with them until January 7. During that month the mother had gone to live with her father and had become reconciled with Ed Smith. On January 7 she went to the McCanns' home and took Brian back with her to live with Ed Smith. Brian continued to visit the McCanns every weekend while he was living with Ed Smith. In February, 1978, Brian's father moved back into his parents' home. On April 19, 1978, the mother again left Ed Smith and both she and Brian moved into the McCanns' home. The mother only stayed a few weeks, however, when she was asked to leave by Mr. McCann because of her relationship with Tom Roberts, her latest boyfriend. The mother left the McCanns' home and went to live with Roberts; Brian remained with his father and the McCanns', and was still living with them at the time of the custody hearing.

The father testified that he was living with his parents in their three bedroom home in Julian. Brian and he shared one bedroom; his parents shared another; and his fourteen year old sister Patricia occupied the third bedroom. He testified that his job as truck driver required his absence from the home for three to four full days per week. During the time he was at work his parents and his sister took care of Brian. He admitted that he had not paid the hospital bills for Brian's birth until the time of the custody petition, and that he had been derelict in paying Brian's support. He also admitted that he had failed to visit Brian when he was first born, and that he had denied paternity.

The father's parents both testified that they wanted Brian to remain with them, and that the relationship between Brian and his father had grown stronger while Brian was living in their home. They testified that their working hours were 8:00 a. m. to 4:00 p. m. for Mr. McCann and from 5:30 p. m. to 1:30 a. m. for Mrs. McCann; Mrs. McCann also worked part time at the local post office. She testified that she soon would be leaving both jobs, however, and that she had already given notice. Patricia took care of Brian when neither her nor her father were at home. Mr. McCann was questioned about his health and admitted to having had a heart attack some eight years earlier and to having to use glycerine pills on occasion. Photographs of the interior and exterior of the McCanns home were offered in evidence.

The mother testified that she was living with Tom Roberts in a three bedroom house that he had purchased in Port Matilda. She said that they planned to get married as soon as Roberts's divorce was completed. Roberts testified as to his willingness to have Brian live with them.

The lower court awarded custody to the father at the close of the testimony. In doing so, the court stated:

In the present case, the indiscretions of wife centered about three different men—Smith, with whom she lived and suffered abuse, a guest at her mother's hotel, with whom she had a short relationship, and her present consort, Roberts, whom she hopes to marry. It is undisputed that the affair with Smith had no adverse effect on the child and, quite the contrary, it appears that Smith was a good and generous provider to the child as well as being affectionately disposed toward him. The second affair was of such short duration and the child of such very tender age as to make him oblivious to any moral overtones.

These lapses could not have had any adverse effect on the child, and therefore should not be charged to the mother as unfitness per se. However, as indicia of the facility with which she drifted into such affairs, this must be taken into consideration in the assessment of her over-all fitness for custody.

Perhaps the most disturbing feature of this type of living is the relative insecurity that it engenders. At the present moment her future is uncertain—is she on the verge of marriage, or is the present arrangement an interlude between affairs? It is this consideration that touches upon the welfare of the child, for if wife shall drift from affair to affair with her child in its formative years, the impermanance and instability of such relationships cannot help but have a detrimental effect on the child.

Agreed that this is speculative, and may not at all come to pass, but it is nevertheless a consideration that cannot be ignored.

To turn the coin, under the present custody arrangement, while technically in the father, it is in actuality vested in the grandparents, who provide the major portion of the care, control and rearing of the child. This is not to say that the father does not love and is attempting to be a father to his son, but there is no doubt that the grandmother is a substitute mother for the child.

*     *     *     *     *     *

In the judgment of the Court the scales weight [sic] nearly even, except for the impermanance of the arrangement under which wife-respondent is now living. Should her marriage plans not materialize she would again be adrift, with no place to go and no means to support herself, again dependent upon the largess of someone else. On the other hand, the child in the custody of the father is in a secure haven that provides an atmosphere of serenity and affection.

This is not to say, and the Court does not imply, that wife-respondent is an unfit person. However, the precariousness of her present station, and the tenuous nature of its continuance, mitigate against the present transfer of this child from security to insecurity, from the relative predictable to the unpredictable.

Meanwhile, we would caution the grandparents that under proper circumstances the needs of a child are best

fulfilled by a parent, and that they should not become so emotionally entangled in the life of their grandson that they cannot face altered circumstances.

This adjudication does not foreclose the mother's rights forever. An adjudication of custody is of transitory nature, based upon the determination of what are the best interests viewed in today's light, with the realization that the light of the future may present the picture in a different perspective.

Lower Court Opinion at 7–9.

■ The mother argues that the lower court employed an improper standard with respect to the burden of proof. In *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977), this court held that where the child custody contest is between the mother and the father, "[t]he burden of proof is shared equally by the contesting parents; thus, the hearing judge awards custody according to what the preponderance of the evidence shows." *Id.*, 249 Pa.Super. at 280, 376 A.2d at 651; *see Sipe v. Shaffer*, 263 Pa.Super. 27, 35, 396 A.2d 1359, 1363 (1979). The preponderance standard does not apply in a contest between a parent and a third party, however, as in that case, the parent's "prima facie right to custody" will only be forfeited if "convincing reasons" appear that the child's best interest will be served by an award to the third party. *In re Custody of Hernandez, supra* 249 Pa.Super. at 285, 376 A.2d at 654; *see Commonwealth ex rel. Strunk v. Cummins*, 258 Pa.Super. 326, 392 A.2d 817 (1978). In the mother's view, the present action was not really a contest between her and the father but was one between her and the father's parents. She argues, therefore, that custody of Brian should have remained with her, since the grandparents did not demonstrate "convincing reasons" for an award to them.

■ We are not persuaded by this argument. The petition was filed by the father in his name, and the lower court decided it based upon a comparison of the living conditions of the father and the mother. The evidence that the father lived with his parents, and that they had a strong interest in

having Brian remain with them, did not convert the contest into one between the mother and the grandparents, so that the evidentiary scale was tipped heavily in the mother's favor, *see In re Custody of Hernandez, supra* 249 Pa.Super. at 285, 376 A.2d at 654, but was instead viewed as significant by the lower court only to the extent that it demonstrated the type of home in which the father lived and in which he planned to raise Brian. It was the lower court's duty to consider the home environment offered by the father, *see Valentino v. Valentino,* 259 Pa.Super. 395, 393 A.2d 885 (1978), and Brian's grandparents played a crucial part in this home environment. To accept the mother's argument would suggest that a parent's prima facie right to custody would somehow be lost if the parent went to live in his or her parents' home. *See Haraschak v. Haraschak,* 268 Pa.Super. 173, 407 A.2d 886 (1979).

■ The mother also argues that the decision granting custody to the father was not in Brian's best interests. In support of this argument she points to the evidence that the father had denied paternity and neglected to visit or support Brian during the first year of Brian's life, and the evidence that she had always taken good care of Brian. However, the court considered all of this evidence, as is shown by its opinion, and by its statement that "the scales weight nearly even." We are not persuaded that the court erred because it found the evidence of the instability of the mother's situation determinative.

■ The mother argues, however, that the lower court's opinion demonstrates that it misapprehended the evidence.[1] We have undertaken an independent and full view of the record, as we are required to do in child custody cases, *see Sipe v. Shaffer, supra; Scarlett v. Scarlett,* 257 Pa.Super. 468, 390 A.2d 1331 (1978), and have discovered that the court did in fact misapprehend the date on which the father moved back to his parents' home. The court stated that the

---

[1]. The mother also argues that the lower court erred in admitting hearsay evidence and in concluding that she was immature. These arguments are without merit, and do not require discussion.

father moved back to his parents' home immediately after the divorce, which was in July, 1976, whereas the testimony was that it was not until February 1978. Nevertheless, the court's decision with respect to the relative stability of the father's and mother's situations was warranted on the record. Its misapprehension of the evidence in this one respect does not require reversal.

While we shall therefore affirm the lower court's order, we emphasize, as did the lower court, that decisions with respect to child custody are subject to such change as changed conditions may require.[2]

Affirmed.

2. Appellant has stated in her brief that Brian's grandmother was hospitalized for a heart attack in November, 1978, and that because of this Brian was sent to live with her. Appellee disputes this statement.