417 A.2d 651

**Michael W. SUMMERS**

v.

**Kathy B. SUMMERS, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed Dec. 21, 1979.

Donald F. Driscoll, Bloomsburg, for appellant.

John A. Mihalik, Bloomsburg, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

The lower court granted a father's petition for custody of his minor son, Todd. The mother appeals, contending that the lower court erred and that the best interests of Todd will be served by granting custody to her.

The father was eighteen and the mother was sixteen at the time of their marriage in May 1975. Todd, their only child, was born in November 1975. The parties separated in the fall of 1977 and were later divorced. After the separation the father went to live with his parents in their home on Elm Street in Danville, and the mother and Todd went to live with David Diehl, a friend of the mother's, at Diehl's father's house in Danville. The father filed a petition for custody of Todd in February 1978. On March 30, 1978, upon stipulation and agreement of the parties, an order was entered granting custody of Todd to the mother with extensive visitation to the father, including five weeks of visitation during the summer. In August 1978 the father filed a petition asking that the order of March 30th be modified to grant custody of Todd to him. A hearing was held on this petition on January 10, 1979, and on April 26, 1979, the lower court filed an opinion and order awarding custody of Todd to the father. This appeal followed.

The testimony offered at the custody hearing of January 10 was as follows.

Evelyn Lewis, a Children and Youth Services Director for Montour County, testified as to her investigation of the Diehl home and her interview with Todd's mother. Ms. Lewis testified that the home was located in a sparsely populated rural area and was occupied by David Diehl, his father Nelson Diehl, Todd, and Todd's mother. Todd had his own room. David Diehl and the mother were living as man and wife, although not legally married. The mother served as a housekeeper for the Diehls and was paid sixty dollars per week for this. From her interview with the mother, during her visit, Ms. Lewis learned that the mother, David Diehl, and Todd would often attend motorcycle meets on weekends. They would sometimes travel to these meets in their van and sleep overnight in the van. Occasionally they would stay at a motel. Ms. Lewis described Todd as a very relaxed and precocious youngster, and said that his "relationship [with the mother] was good . . . [t]he child is thriving." She could not offer an opinion as to Todd's relationship with his father, as she had not observed them together. She did investigate the father's home, but no testimony was elicited from her with respect to it, nor is there otherwise any evidence concerning her investigation in the record before us.

The father testified in his own behalf. He worked five days per week from eight in the morning until five thirty at night, and was living in his parents' home with them and his younger brother. He testified that he had been paying $86 per month in support and that he had always been punctual with the payments. He described his parents' home as a three bedroom house with a very large yard. The house is located only three blocks from an elementary school and there are other families with small children in the neighborhood. He said that his parents and brother got along very well with Todd. On cross-examination he admitted that he often went out drinking at night.

The paternal grandfather testified that Todd and the father got along very well while Todd was staying at his house during the five week visitation in the summer of 1978.

Todd fell and broke his leg while visiting. The paternal grandmother testified that her work schedule could and would be arranged so that someone in the family would always be home with Todd.

The mother testified in her own behalf. She said that she and Todd were now living with David Diehl in Danville. They had moved out of Diehl's father's home in December 1978, and had purchased a two bedroom trailer and a ten acre lot and were starting a home of their own. She testified further that neither she nor Diehl were in a hurry to marry but that they would like to get married and have a child within a year or two. She said that they would probably be married before Todd started school "to make stable parents for him while he's in school." She also said that she and Diehl both wanted their relationship to be a permanent one. She described Todd's relationship with Diehl as similar to a father-son relationship.

The mother further testified that in the early part of 1978 she and Todd went to Florida with Diehl. They lived there with Diehl's aunt; Diehl worked at a job and took a motorcycle repair course. In June the mother returned with Todd to Pennsylvania so that Todd could begin his five week visitation period with his father. She went back to Florida but left Diehl to go on what she described as a "wild spree for five weeks" with Paul Szili, a longtime friend. She stayed with Szili in Florida and came back with him to Pennsylvania to get Todd at the end of the five week period. She had missed Todd during the visitation. She and Todd then traveled to New York with Szili in her truck. While there Szili was arrested for possession of marijuana and the truck was impounded for a brief period. After this the mother returned to Danville and resumed her relationship with David Diehl. She said that she did not know why she left him for Szili, that it was foolish, that she was sorry that she did it, and that she decided to return to Diehl during the trip to New York. She admitted that she and Diehl used marijuana on occasion.

David Diehl did not testify at the hearing, because, according to the mother, he had just begun a new job and could not leave the job to testify.

It is settled that the paramount concern in a child custody proceeding is to determine what is in the best interests of the child. *Kimmey v. Kimmey,* 269 Pa.Super. 346, 356, 409 A.2d 1178, 1182 (1979); *Sipe v. Shaffer,* 263 Pa.Super. 27, 34, 396 A.2d 1359, 1363 (1979). In *Lewis v. Lewis,* 267 Pa.Super. 235, 406 A.2d 781 (1979) this court described the respective duties of the lower court and appellate court as follows:

> In order to ensure that the best interests of the child will be served, the appellate court will engage in a comprehensive review of the record. *Scarlett v. Scarlett,* 267 Pa.Super. 468, 390 A.2d 1331 (1978); *In re Custody of Myers,* 242 Pa.Super. 225, 363 A.2d 1242 (1976). Thus, while it will defer to the lower court's findings of fact, the appellate court will not be bound by the deductions or the inferences made by the lower court from those facts, but will make an independent judgment based upon its own careful review of the evidence. *Sipe v. Shaffer, supra; Scarlett v. Scarlett, supra.* In conducting this review, the appellate court will look to whether all the pertinent facts and circumstances of the contesting parties have been fully explored and developed. *See Sipe v. Shaffer, supra; Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). It is the responsibility of the lower court to make a penetrating and comprehensive inquiry, and if necessary, to develop the record itself. *See Commonwealth ex rel. Cox v. Cox,* 255 Pa.Super. 508, 388 A.2d 1082 (1978). After fulfilling this responsibility to ensure a complete record, the court must file a comprehensive opinion containing its findings and conclusions. *See Valentino v. Valentino,* 259 Pa.Super. 395, 393 A.2d 885 (1978); *Gunter v. Gunter, supra.* Only with the benefit of a full record and full opinion can the appellate court hope to fulfill its responsibility of conducting its own careful review. *Valentino v. Valentino, supra.* Where the record is incom-

plete or the opinion of the lower court is inadequate, the case will be remanded. *See Valentino v. Valentino, supra; Commonwealth ex rel. Forrester v. Forrester,* 258 Pa.Super. 397, 392 A.2d 852 (1978); *Commonwealth ex rel. Cox v. Cox, supra,* 267 Pa.Super. at 240, 406 A.2d at 783.

In its opinion awarding custody to the father the lower court stated:

Briefly, the evidence produced at the hearing established the following: (1) that Respondent [the mother] and the child have been living with Respondent's boyfriend since November 1977; (2) that Respondent, the child and the boyfriend are now living in their own trailer, although they had previously been living at the home of the boyfriend's father. The latter had been paying Respondent $60.00 per week to act as his housekeeper; (3) that Respondent went on a five week trip to Florida in June and July, 1978, with a male companion [Szili] other than her current boyfriend; (4) that Respondent also went to Long Island, New York with this same male companion in July, 1978, at which time the male was arrested for transporting several tons of marijuana in a truck registered in Respondent's name; (5) that Respondent was not charged in connection with the incident; (6) that Respondent and her boyfriend have no plans to marry; (7) that Respondent took the child on the trip to New York but left the child with Petitioner [the father] during the five week trip to Florida; and (8) that Petitioner is single, steadily employed, and resides with his parents, who are able and willing to assist Petitioner in caring for the child.

Given these circumstances, we conclude that the child's best interests will be served if custody is awarded to the father, Petitioner herein. We are aware that the child is in no physical distress, and that his material needs are being adequately met at the present time. We are concerned, however, about the moral environment in the home, and particularly the irresponsibility demonstrated by Respondent's recent escapades in Florida and New York.

Even though a parent exhibits unchaste conduct, such behavior does not automatically operate as a bar to custody. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976). However, [ ] meretricious conduct is a relevant factor in a custody determination if the improper conduct has a deleterious effect upon the child.

In the instant case, Respondent has demonstrated a willingness to subordinate her parental obligations in deference to her quest for gratification of various personal desires, romantic and otherwise. Specifically, Respondent was willing to leave her three year old son with his parental grandparents—even though they [*sic*] boy needed extra care and attention because he was recovering from a leg fracture—while Respondent pursued various romantic interests in Florida.

This episode demonstrates a fundamental instability and immaturity which weighs heavily against awarding custody to Respondent. Respondent's subsequent trip to New York, also with a male companion, is further evidence of such immaturity and irresponsibility.

Under the circumstances, we believe that the child will have a greater opportunity for a stable, beneficial home environment, if custody is awarded to Petitioner. We are satisfied that Petitioner is better able to meet the child's physical, moral, and spiritual needs.

Opinion of the Lower Court at pp. 1–3.

The lower court's opinion is not only not very comprehensive, but it is also inaccurate.

The court's conclusion that the mother "has demonstrated a willingness to subordinate her parental obligations in deference to her quest for gratification of various personal desires, romantic and otherwise" is evidently based upon the court's finding that the mother "was willing to leave her three year old son with his paternal grandparents—even though the[ ] boy needed extra care and attention because he was recovering from a leg fracture—while [the mother] pursued various romantic interests in Florida." This description of the trip to Florida with Szili is inaccurate in two

respects. First, it confuses cause and effect. The evidence demonstrated that the reason the mother left Todd with the father and grandparents was because she was under a court order to surrender Todd to the father for five weeks visitation. Her romantic interest, thus, was not the cause of her leaving Todd, although one effect of her leaving Todd was that she felt somewhat freer, and took the opportunity to go on a "wild spree"· with Szili. Second, Todd did not have a broken leg when the mother left him with his father and grandparents; he broke it while with his father after his mother had left. Thus the record does not show the mother to be so callous and irresponsible as one might gather from the lower court's opinion.

The court's finding that Szili "was arrested for transporting several tons of marijuana in a truck registered in [the mother's] name" is also not supported by the evidence on the record. While the father's attorney, in questioning the mother, stated, "I believe eight ton of marijuana was found in your truck," the mother denied this, stating that the police had only found a bag of seeds on Szili, and that she was not present when he was arrested. There was no other testimony about the amount of marijuana, and the court's finding that several tons were involved is not substantiated.

The court's finding that the mother and David Diehl "have no plans to marry", while correct in the sense of "no specific plans," is misleading. As mentioned above, the mother testified that she and Diehl did plan to marry in a year or two or at least before Todd started school, and that they looked upon their present relationship as a permanent one although they were in no hurry to marry.

■ The lower court's misapprehensions of the evidence, especially with respect to the broken leg and the marijuana, were not minor ones. Indeed, the lower court specifically relied on these incidents in concluding that the mother was fundamentally unstable, immature, and irresponsible. Given these misapprehensions of significant facts, we find ourselves unable to affirm the court's order. *But see McCann v. McCann,* 270 Pa.Super. 171, 177, 411 A.2d 234, 238 (1979)

(order as to custody affirmed despite misapprehension of a minor part of the evidence).

In some cases where the lower court has failed to file a proper opinion in support of its custody decision, we have not remanded the case, but have instead decided the question of custody based upon our own examination of the record. *See Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979); *Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 204, 374 A.2d 1386, 1390 (1977); *Sweeny v. Sweeny*, 241 Pa.Super. 235, 361 A.2d 302 (1976). Such cases are rare, however, and the usual course is to remand the case to permit the lower court to receive further evidence, if that is indicated, and to file a more comprehensive opinion setting forth its reasons, including its findings as to the credibility of the witnesses and the weight to be attached to the testimony. *See Kimmey v. Kimmey, supra* (collecting cases); *Garrity v. Garrity*, 268 Pa.Super. 217, 407 A.2d 1323 (1979); *Lewis v. Lewis, supra.*

█ This case not only requires a remand for a new opinion, it also requires that an entire new hearing be held as there are several significant gaps in the record, which prevent both this court and the lower court from making a truly informed decision as to the custody of Todd. One such gap is David Diehl's failure to testify at the hearing. Without his testimony, the lower court could not make a valid comparison of the respective homes and determine Diehl's attitude toward Todd, and his fitness to assume some part of the care of Todd. *See Commonwealth ex rel. Schwarz v. Schwarz*, 252 Pa.Super. 95, 380 A.2d 1299 (1977) (remanded where father did not testify at the hearing). Moreover, our cases have consistently stressed the importance of the lower court receiving evidence by social workers or other investigators concerning the living conditions and habits of the parents, their relationship with the child, and the condition of the respective homes. Where the record does not contain sufficient information on these subjects, we have remanded for a more complete hearing. *See Lewis v. Lewis, supra* (collecting cases); *and see Rupp v. Rupp*, 268 Pa.Super. 467,

408 A.2d 883 (1979) (remand for disinterested testimony on homes and psychiatric testimony). Here, while the lower court had Ms. Lewis conduct an investigation of both homes, for some reason she only testified concerning the mother's home, and made no mention of the father's home. Moreover, her comments with respect to the mother's home were of little benefit to either this court or the lower court, since the mother, Todd, and Diehl had moved to a new home just before the hearing was held. Upon remand, therefore, a new study of the respective homes of the parties should be undertaken and testimony concerning both homes and the relationship of each parent with the child should be received and considered by the lower court.

By our discussion above we do not in any way intend to set any limit upon the hearing to be conducted after the case is remanded. Indeed, determinations as to child custody are temporary and "subject to such change as changed conditions may require." *McCann v. McCann, supra,* 270 Pa.Super. at 178, 411 A.2d at 238. Thus all evidence in any way probative with respect to the questions of the relative fitness of the parties and the best interests of Todd should be considered, including evidence of any events that have occurred since the hearing on January 10, 1978.

Reversed and remanded for further proceedings consistent with this opinion.

HESTER, J., files a dissenting statement.

HESTER, Judge, dissenting:

I dissent. I would affirm on the Opinion of Judge Myers of the court below. The facts upon which Judge Myers' Opinion is structured are not in dispute. Said facts more than substantiate the finding that appellant has "demonstrated a willingness to subordinate her parental obligation in deference to her quest for gratification of various personal desires, romantic and otherwise."

The trial court was most charitable in his evaluation of appellant's character as demonstrated by her admitted con-

duct. Those facts are more than sufficient to sustain the finding that the best interests of the child will be served by having him raised in the sane, normal environment to be provided by his father-appellee.